ALVIN B. RUBIN, Circuit Judge:
We hold that a debtor who converts nonexempt assets to an exempt homestead immediately before bankruptcy, with intent to defraud his creditors, must be denied a discharge in bankruptcy because of the provisions of Section 727 of the Bankruptcy Code, 11 U.S.C.A. § 727 (West 1979), and, therefore, we affirm the decision of the district court.
I.
Hugh D. Reed, as sole proprietor, opened a shop using the trade name, Reed’s Men’s Wear, in Lubbock, Texas. He financed the venture in part by obtaining from the Texas Bank & Trust Company a $150,000 loan which was guaranteed by the Small Business Administration (SBA). Three months later, the bank gave Reed a $50,000 line of credit, and the SBA agreed that the original loan would be subordinated to the line of credit. The store showed a profit for the first nine months of operation in 1977, but began to lose money in 1978. By February 1979, Reed knew that his business was insolvent. After meeting with the bank, the SBA, and his major trade creditors, he signed an agreement to turn over management of the store to a consulting firm for the year 1979. In turn, Reed’s trade creditors agreed to postpone collection efforts and Reed promised to resume payments in January 1980. Despite management by the consultant, the business continued to fail, and on December 15, 1979, Reed and his wife, Sharon Marcus Reed, signed a foreclosure agreement surrendering the store to the bank. Six days later, the Reeds filed voluntary petitions for bankruptcy.
From 1977 to 1979, in addition to operating Reed’s Men’s Wear, Reed traveled extensively as a sales representative for Scully Leather, Inc. (Scully). In 1977, he worked in Reed’s Men’s Wear about 75% of the time and traveled for Scully about 25% of the time. In 1978, he divided his time evenly between the store and sales for Scully. By 1979, he worked in the store only 40% of the time, and traveled for Scully 60% of the time. On the advice of his accountant, in December 1978 and January 1979 Reed set up Reyata Corporation (Reyata), wholly owned by himself, to receive the sales commissions paid by Scully for his services. Reyata in turn paid some of the commissions to Reed as salary. This arrangement allowed the corporation to retain part of Reed’s earnings and reduced the tax paid by Reed on his commissions. In 1979, Scully paid Reyata $15,000 in commissions each month, including an advance commission for December, sent at Reed’s request, that would not otherwise have been paid until January 1980. The bankruptcy judge found that Reyata was simply Reed’s alter ego.
Reed had catholic interests and much energy. He found time to collect antiques, gold coins, and guns, and to make other investments. In a financial statement provided to the bank and to the SBA on April 1, 1979, Reed valued his gun collection at $20,000 and his antiques collection at $3,000. In the four months prior to bankruptcy, Reed augmented each of his collections. He caused Reyata to borrow $11,000, which he used to purchase more antiques. In three separate transactions during October and *989 November, Reed accumulated, at a cost of $22,115, a collection of Krugerrands and Mexican fifty-peso pieces. One month before filing for bankruptcy, Reed purchased, for $15,000, a one-third interest in a business known as Triple BS Corporation.[1]
Two months before bankruptcy, Reed opened an account at the Bank of the West without the knowledge of his creditors. Prom that time until the store closed in mid-December, he deposited the daily receipts from Reed’s Men’s Wear in this separate account. From this account, in late November Reed repaid the loan Reyata made to purchase the antiques.
Reed began selling his personal assets in late November. He first sold three items from his antiques collection to an acquaintance, Charles Tharpe, for $3500. He sold the remainder of his antiques on December 11 to a friend, Steve Gallagher, for $5,000. Whether this represented their fair market value was not established, but the total realized on the antiques was $8,500, while the original value plus the cost of recent purchases was $14,000. On December 10, he sold his gold coins through a broker for $19,500 cash, their approximate market value. The next day, on December 11, Reed sold to Gallagher for $5,000 each both his gun collection and his Triple BS stock. Whether or not Gallagher paid fair market value for the items was not established, but the stock had been purchased only one month earlier for $15,000.
Reed applied all of the proceeds to reduce the mortgages on his family residence, which was exempt from creditor’s claims under Texas law, with the objective, the bankruptcy court found, of reducing the value of his nonexempt assets and increasing the value of his homestead exemption prior to bankruptcy. Thus he raised about $35,000, applying about $30,000 to wipe out a second mortgage home improvement loan and applying the balance of approximately $15,000 to reduce the first mortgage on his home to about $28,000.
Reed cavalierly justified his sale of assets for what appeared to be less than their fair market value. This was of no concern to his creditors, he testified, because, if he had received more for the assets, he would have simply applied the additional sum to reduce the mortgage on his homestead. No matter how much he got, there would be nothing for his creditors.
Reed also failed to account for the disposition of $19,586.83 in cash during the year preceding filing. Reed attempted to explain the “unaccounted for” cash by testifying that he habitually carried huge sums of money in cash on his person and frequently made purchases and payments in cash without obtaining receipts. He argued that the amount of “unaccounted for” cash represents only a small percentage of the amount of money which went through his hands in 1979.
The bankruptcy judge found that Reed had effected transfers designed to convert nonexempt property into exempt property less than two weeks before bankruptcy with the intent to hinder, delay, or defraud creditors. 11 U.S.C.A. § 727(a)(2) (West 1979). He found that, regardless of the amount of money that might have passed through Reed’s accounts, $19,586.83 is a significant sum, and that Reed had failed satisfactorily to explain its loss. This constituted an additional basis for denying discharge. 11 U.S.C.A. § 727(a)(5) (West 1979).
The district court affirmed the judgment.
II.
The Bankruptcy Code provides that a debtor may be denied discharge if he has transferred property “with intent to hinder, delay, or defraud a creditor,” 11 U.S.C.A. § 727(a)(2) (West 1979), or has “failed to explain satisfactorily ... any loss of assets .... ” 11 U.S.C.A. § 727(a)(5) (West 1979). Reed was denied discharge on both bases. Though either would suffice, we review the grounds seriatim.
In considering the effect of Reed’s transfers of assets, we distinguish, as did the careful opinion of the bankruptcy court, the *990 debtor’s entitlement to the exemption of property from the claims of his creditors and his right to a discharge from his debts. The Bankruptcy Code allows a debtor to retain property exempt either (1) under the provisions of the Bankruptcy Code, if not forbidden by state law, 11 U.S.C.A. § 522(b) & (d) (West 1979), or (2) under the provisions of state law and federal law other than the minimum allowances in the Bankruptcy Code, 11 U.S.C.A. § 522(b)(2) (West 1979).
Under the Bankruptcy Act of 1898, most courts, applying state exemption laws, had held property that would otherwise have been exempt to be deprived of its immunity if there was evidence other than the simple act of conversion showing that the debtor had acquired it with the intention of defrauding his creditors. Miguel v. Walsh, 447 F.2d 724 (9th Cir.1971); Shanks v. Hardin, 101 F.2d 177 (6th Cir.1939); Kangas v. Robie, 264 F. 92 (8th Cir.1920); In re Gerber, 186 F. 693 (9th Cir.1911); In re White, 221 F.Supp. 64 (N.D.Cal.1963); In re Martin, 217 F.Supp. 937 (D.Or.1963); In re Majors, 241 F. 538 (D.Or.1917). If intent to defraud was not proved, however, and it was shown only that granting the exemption would defeat the creditor’s claim, the exemption was granted. Wudrick v. Clements, 451 F.2d 988 (9th Cir.1971) (per curiam); Huenergardt v. John S. Brittain Dry Goods Co., 116 F. 31 (8th Cir.1902); In re Dudley, 72 F.Supp. 943 (S.D.Cal.1947); In re Silansky, 21 F.Supp. 41 (E.D.Pa.1937). As stated in 3 Collier on Bankruptcy, 1522.08[4] (15th ed. 1982): “Under the Act, the mere conversion of nonexempt property into exempt property on the eve of bankruptcy was not of itself such fraud as will [sic] deprive the bankrupt of his right to exemptions.” (Emphasis supplied.)
Before the Bankruptcy Code was adopted in 1978, it had been urged that property obtained in such last-minute conversions be ineligible for exemption. Id. See, e.g., Proposed Bankruptcy Act Revision, Hearings in H.R. 31 and H.R. 32 before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 94th Cong., 2d Sess. 1355 (1976) (Statement of Hon. Arnold K. Phelps). The Code, however, adopts the position that the conversion of nonexempt to exempt property, without more, will not deprive the debtor of the exemption to which he would otherwise be entitled. 3 Collier, supra, 1522.08[4]. Thus, both the House and Senate Reports state:
As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.
H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), reprinted in 1978 U.S. Code Cong. & Ad.News 5963, 6317; S.Rep. No. 989, 95th Cong., 2d Sess. 76, reprinted in 1978 U.S. Code Cong. & Ad.News 5787, 5862 (emphasis supplied). The rationale behind this congressional decision is summed up at 3 Collier, supra, If 522.08[4]: “The result which would obtain if debtors were not allowed to convert property into allowable exempt property would be extremely harsh, especially in those jurisdictions where the exemption allowance is minimal.” Nonetheless, the phrase, “[a]s under current law,” qualifies the apparently blanket approval of conversion, since as noted above, courts denied exemptions under the Act if there was extrinsic evidence of actual intent to defraud (and if the state law permitted disallowance of the exemption for fraud).
Reed elected to claim his exemptions under state law. The bankruptcy judge, therefore, referred to Texas law to determine both what property was exempt and whether the exemption was defeated by the eleventh-hour conversion. Texas constitutional and statutory protection of the homestead is absolute, and the bankruptcy judge interpreted Texas law to allow the exemption in full regardless of Reed’s intent.[2] *991 See Swayne v. Chase, 88 Tex. 218, 30 S.W. 1049 (1895); Garrard v. Henderson, 209 S.W.2d 225 (Tex.Civ.App.1948); Finn v. Krut, 13 Tex.Civ.App. 36, 34 S.W. 1013 (1896); Bell v. Beazley, 18 Tex.Civ.App. 639, 45 S.W. 401 (1898); Southern Irr. Co. v. Wharton Nat’l Bank, 144 S.W. 701 (Tex.Civ. App.1912). Cf. In re Hammonds, 198 F. 574 (E.D.Ky.1912) (since state statutory protection of exemption is absolute, intent of debtor is irrelevant to allowance of exemption).
While the Code requires that, when the debtor claims a state-created exemption, the scope of the claim is determined by state law, it sets separate standards for determining whether the debtor shall be denied a discharge. The debtor’s entitlement to a discharge must, therefore, be determined by federal, not state, law. In this respect, 11 U.S.C. § 727(a)(2) is absolute: the discharge shall be denied a debt- or who has transferred property with intent to defraud his creditors. The legislative history of the exemption section, as noted above, does not mean that conversion is never fraudulent as to creditors, but simply that, as under prior law, mere conversion is not to be considered fraudulent unless other evidence proves actual intent to defraud creditors. While pre-bankruptcy conversion of nonexempt into exempt assets is frequently motivated by the intent to put those assets beyond the reach of creditors, which is, after all, the function of an exemption, evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge. For example, evidence that the debtor, on the eve of bankruptcy, borrowed money that was then converted into exempt assets would suffice to support a finding of actual intent to defraud. Only if such a finding is made may a discharge be denied.[3]
The evidence amply supports the bankruptcy court’s finding that Reed had an actual intent to defraud. Reed’s whole pattern of conduct evinces that intent. Cf. Farmers Co-op. Ass’n v. Strunk, 671 F.2d 391, 395 (10th Cir.1982) (“Fraudulent intent of course may be established by circumstantial evidence, or by inferences drawn from a course of conduct.”) His rapid conversion of nonexempt assets to extinguish one home mortgage and to reduce another four months before bankruptcy, after arranging with his creditors to be free of payment obligations until the following year, speaks for itself as a transfer of property in fraud of creditors. His diversion of the daily receipts of Reed’s Men’s Wear into an account *992 unknown to his creditors and management consultant and his subsequent use of the receipts to repay a loan that had been a vehicle for this conversion confirm his fraudulent motivation. Cf. In re Martin, 217 F.Supp. 937 (D.Or.1963) (transfer of nonexempt property is fraudulent if effected with actual intent to place property beyond the reach of creditors); In re Schwingie, 15 B.R. 291, 295 (W.D.Wis.1981) (“When effected with actual intent to place property beyond the reach of creditors, the transfer of nonexempt property for exempt property is fraudulent ...). See generally Resnick, Prudent Planning or Fraudulent Transfer? The Use of Non-Exempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy, 31 Rutgers L.Rev. 615 (1978).
The fact findings of the bankruptcy judge, affirmed by the district court, are to be credited by us unless clearly erroneous. See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,-U.S. --•,- n. 5, 102 S.Ct. 2858, 2863 n. 5, 73 L.Ed.2d 598, 605 n. 5 (1982); Gary Aircraft Corp. v. General Dynamics Corp., 681 F.2d 365, 375 n. 14 (5th Cir.1982); In re Oesterle, 651 F.2d 401, 403 (5th Cir.1981), cert. denied, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982); Highland Village Bank v. Bardwell, 610 F.2d 228, 230 (5th Cir.1980) (per curiam), and the finding of actual intent to defraud, based on evidence other than the fact of the conversion, patently was not permeated with error. The denial of a discharge on this ground alone was appropriate. It would constitute a perversion of the purposes of the Bankruptcy Code to permit a debtor earning $180,000 a year to convert every one of his major nonexempt assets into sheltered property on the eve of bankruptcy with actual intent to defraud his creditors and then emerge washed clean of future obligation by carefully concocted immersion in bankruptcy waters.
Reed asserts that denial of a discharge makes the exemption meaningless. This is but fulmination. Reed may retain his home, mortgages substantially reduced, free of claims by his creditors. In light of the ample evidence, aside from the conversion itself, that Reed had an actual intent to defraud his creditors, he simply is not entitled to a discharge despite the fact that a generous state law may protect his exemption.
The argument that we should reject the other ground for denying discharge gets but the short shrift it deserves. We must affirm the fact findings of the bankruptcy court unless they are clearly erroneous. See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,-U.S. at-n. 5,102 S.Ct. at 2863 n. 5, 73 L.Ed.2d at 605 n. 5. The fact findings concerning unaccounted-for cash, which we have already summarized, are amply supported by the record.
Reed asserts that the trial court incorrectly imposed the burden of proof of fund-accounting on him despite the provision of Bankruptcy Rule 407 which places the burden on the creditors.[4] We find no such shifting of burden, nor reliance on burden of proof standards in the opinion. While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case. The creditor’s burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss *993 of his assets. Cf. In re Shapiro & Ornish, 37 F.2d 403 (N.D.Tex.1929), aff’d 37 F.2d 407 (5th Cir.1930) (debtors offered vague explanations unconvincing to bankruptcy referee or.reviewing courts). The three-judge bankruptcy appellate court in Shapiro construed the identical language of the Bankruptcy Act of 1898 that the debtor may be denied a discharge if he “has failed to explain satisfactorily any losses of assets or deficiency of assets,” 11 U.S.C. § 32(c)(7):
The word “satisfactorily[,]” . .. may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation — he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented.
37 F.2d at 406. Here, as in Shapiro, the debtor’s explanation fails to induce such contentment. Asked to account for the disappearance of $19,586.83, Reed could only respond that he had many business and household expenses which he paid for in cash as they arose, and that he had lost an unspecified amount of cash gambling in Las Vegas. We cannot fault the bankruptcy judge’s finding that this did not constitute a satisfactory explanation.
III.
The district court found that Sharon Marcus Reed benefitted from the “prohibited activities” and possibly had knowledge of them but that she did not participate in them. Accordingly, he granted her discharge. The evidence showed that Sharon Reed made out the daily reports of the sales receipts of Reed’s Men’s Wear during the time that Reed was surreptitiously diverting those receipts to a bank account unknown to his creditors and management consultant. From this, it would have been possible to infer that Sharon Reed shared her husband’s fraudulent intent, but the bankruptcy judge’s findings to the contrary are not clearly erroneous. Cf. Harris v. Atchison, T. & S.F. Ry., 538 F.2d 682, 688 (5th Cir.1976) (“[T]he finding of the district court with regard to plaintiffs’ subjective state of mind is not clearly erroneous and must be affirmed .... ”). That dictates affirmance of the result.
While the trustee and creditors contend the ruling was based on an incorrect standard, their major attack is on the sufficiency of the evidence to support the conclusion by pointing out all that Mrs. Reed did in the men’s wear business and in connection with her husband’s activities. The one legal issue raised by'the trustee and creditors is whether the intent to defraud requisite under 11 U.S.C. § 727 must be shown for each debtor. The bankruptcy court correctly concluded that the Code does not allow attribution of intent from spouse to spouse. Cf. United States v. One 1977 Cherokee Jeep, 639 F.2d 212 (5th Cir. 1981) (forfeiture of vehicle permissible because reasonable inference could be drawn from wife’s suspicion of husband’s illegal activities that she knew jeep being used in furtherance of activities, even if she did not share criminal intent).
IV.
Clinging to a last straw, Reed argues that the trial court erred in allowing the prosecution of these adversary proceedings by an SBA attorney after the United States Attorney announced that the United States was not a party to the litigation. We need not now determine whether the bankruptcy court’s ruling that allowed the SBA attorney to represent the interests of the United States and the other plaintiffs is “an order or judgment” reviewable on appeal by this court. See 28 U.S.C.A. § 1334 (West Supp.1982) and Bankruptcy Code of 1978, Pub.L.No. 95-598, Title IV, § 405, 92 Stat. 2686 (1978), reprinted in note preceding 28 U.S.C.A. § 1471 (West Supp.1982), and Bankr.R. 801, which provide that an appeal may be taken from a judgment or order of a bankruptcy judge to a district court. Even if an appeal lies, the ruling was without fault. The SBA was a true party in interest. If the bank that made *994 the SBA loan did not recover on it, the loss would fall on the SBA. There was, therefore, no denial of fairness, fundamental (as asserted by Reed) or otherwise, in its participation.
For these reasons, the judgment is AFFIRMED.

. The significance of the initials is not elucidated in the record.

. Tex. Const, art. 16, § 50 prohibits the forced sale of a homestead for any purpose other than purchase money liens, improvement liens, or taxes. Tex. Const, art. 16, § 51 and Tex.Rev.
*991 Civ.Stat. Ann. art. 3833(a)(3) (Vernon 1982) define an urban homestead as a lot not exceeding $10,000 in value at the time it is designated as a homestead, without reference to the value of any improvements to the lots.
The allowance of the exemption is not challenged. We need not, therefore, determine whether under Texas law the exemption would be denied to property acquired with the intention of defrauding creditors. See Tex.Rev.Civ. Stat. Ann. art. 3836(b) (Vernon 1982), which denounces acquiring personal property with the intent to defraud, delay or hinder creditors, and excepts such property from protection from forced seizure.

. See In re Adlman, 541 F.2d 999 (2d Cir.1976) (reversing denial of discharge where no extrinsic evidence of actual intent to defraud); Forsberg v. Security State Bank, 15 F.2d 499 (8th Cir.1926) (same); In re Schwingle, 15 B.R. 291 (W.D.Wis.1981) (denial of discharge and set-aside of conversion where finding of actual intent to defraud supported by extrinsic evidence). See also In re Silansky, 21 F.Supp. 41 (E.D.Pa.1937) (reversing denial of discharge, citing Forsberg, but also seeming to hold grant of discharge dependent on state-law validity of exemption); In re Collins, 19 B.R. 874, 877 (Bkrtcy.M.D.Fla.1982) (denying discharge and adopting opinion below in Reed) (“Some transfers certainly are permissible and should be encouraged. However, cases with a factual scenario which reveal that business assets which belong to creditors are being used to delete individual debts will not be permitted.”); In re Zouhar, 10 B.R. 154 (Bkrtcy.D.N.M.1981) (denying discharge where result of conversions would be to allow debtor “head start” of $130,-000 in exempt assets and $70,000 annual income; citing unlimited nature of exemption in question, facts that amount converted would have satisfied all creditors’ claims and that conversion rendered debtor insolvent, and debt- or’s statement that he converted assets in order to shield them, and distinguishing cases holding mere conversion nonfraudulent as dealing with smaller amounts; consistent, however, with result here, for there was considerable extrinsic evidence of intent to defraud).

. Bankruptcy Rule 407 reads: “At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection.” The rule, which became effective in 1973, replaced the statutory directive, at 11 U.S.C. § 32(c), that the burden of proof on the debtor’s entitlement to a discharge shifted to the debtor once a creditor had presented a prima facie case for denial of the discharge. In re Oesterle, 651 F.2d 401, 403 (5th Cir.1982), cert. denied, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982). Since adoption of the Bankruptcy Code, interim bankruptcy rules without the force of law have been formulated for the optional use of bankruptcy courts, but these do not address the burden of proof on the debtor’s entitlement to a discharge. The Bankruptcy Rules adopted in 1973 continue in effect in the Northern District of Texas, where this proceeding arose, pending adoption of new procedural rules tailored to the Bankruptcy Code.