In re W. Dwight CHURCH, Debtor.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

**v.**

**W. Dwight CHURCH, Defendant.**

**Bankruptcy No. 3–83–01082.
Adv. Nos. 3–83–0861, 3–84–0012.**

United States Bankruptcy Court, E.D. Tennessee.

Feb. 28, 1985.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether discharge should be denied because of prepetition transfers assertedly within the scope of 11 U.S.C.A. § 727(a)(2)(A) (1979). Denial of discharge is also requested on the basis that the debtor has failed to satisfactorily explain a loss of assets, 11 U.S.C.A. § 727(a)(5) (1979).

### I

On July 8, 1983, an involuntary chapter 7 petition was filed against the debtor. An order for relief was entered on July 29, 1983. These consolidated adversary proceedings were commenced by First Tennessee Bank and the Federal Deposit Insurance Corporation (FDIC). Both proceedings were prosecuted at trial by FDIC, substituted as plaintiff in Adv.Proc. No. 3–83–0861 in the place and stead of First Tennessee Bank. Although numerous allegations under § 523(a) and § 727(a) were asserted in the complaints, all claims except objections to discharge under § 727(a)(2)(A) and § 727(a)(5) were dismissed at or prior to commencement of trial.[1]

FDIC contends, that within one year preceding his bankruptcy, debtor, with intent to hinder, delay, or defraud his creditors, transferred: (1) an interest in his marital residence to his wife creating a tenancy by the entirety; (2) a mortgage interest in his marital residence to his parents; and (3) forty (40) percent of the stock in Mountain Marketers, Inc., a closely held corporation, to his father. FDIC also contends debtor has failed to explain satisfactorily the disposition of $50,950 in cash proceeds from prepetition sales of certain assets. At trial FDIC relied solely upon the testimony of the debtor and his father, Walter T. Church.

For a number of years preceding bankruptcy debtor was engaged in the conve-

Morton, Lewis, King & Krieg, Deborah C. Stevens, John Neal, Knoxville, Tenn., for Federal Deposit Ins. Corp.

Stone & Hinds, George F. Legg, Nancy L. Carnes, Knoxville, Tenn., for debtor.

---

1. The FDIC conceded at trial that debtor's motion for summary judgment on the question of nondischargeability under § 523(a)(2)(A) and (B) was well taken.

nience food store business in the Knoxville, Tennessee, area. His initial involvement as an owner-operator of convenience stores came in 1978.

The debtor and his first wife were divorced in 1978. During that same year he met and began dating his present wife, Kathryn Church, whom he married in 1980. Kathryn and the debtor each owned their own home when they began to discuss the possibility of their marriage. They agreed to build a new house for their marital residence. Further, the debtor promised Kathryn they would jointly own their future marital residence. In January 1979 they found a house under construction which they both liked. With Kathryn's approval, debtor purchased the house in April 1979. Because they were not married when debtor purchased the property, title was acquired in his name singularly. Kathryn selected draperies, furniture, and wallpaper for the new home. Title remained in the debtor's name and was not changed to reflect the couple's intended joint ownership until December 8, 1982, a date within one year of the filing of debtor's involuntary bankruptcy petition.

In June 1981 the debtor purchased, and owned through corporate ownership, a convenience food store business known as Smoky Mountain Markets. With the emergence of plans for the opening of the World's Fair, scheduled in May 1982, the debtor set out to expand his convenience store locations to take advantage of the anticipated economic windfall. In addition, the debtor became involved in other World's Fair projects relating to food service and transportation, principally through corporate entities.

One of the corporate entities through which the debtor pursued these projects was Mountain Marketers, Inc., a closely held corporation in which he and his father each owned forty (40) percent of the common capital stock.[2] After leasing a prime business location in Gatlinburg, Tennessee, the debtor began extensive remodeling, costing approximately $300,000. As part of the remodeling, Mountain Marketers leased certain equipment from United American Financial Corporation for use in its Gatlinburg operation.

In May 1982 the debtor purchased a forty-three (43) foot yacht. He borrowed both the initial deposit of $5,000 and the $31,000 downpayment from his father. The deposit money was loaned to the debtor in cash; the downpayment was advanced to him by a check dated May 20, 1982. Thereafter, in July or August 1982, debtor further borrowed from his father $4,000 cash, in two $2,000 installments, to effect repairs and improvements to the yacht. In September 1982 debtor borrowed an additional $9,700, transferred by check, from his father to pay an interest payment on a bank note secured by the yacht. Upon receipt of the $31,000 advance in May 1982, debtor promised his father he would either repay the money advanced for the yacht when the anticipated sale of his marital residence was closed or that he would grant his father a second mortgage on the residence to secure the debt.[3]

In late summer or early fall 1982, debtor sought advice from Earl Rainwater, his tax attorney. Debtor had entered into a contract to sell his marital residence and was negotiating to purchase a larger, more expensive home for his family. He consulted Rainwater about the tax considerations involved in the sale of the marital residence and acquisition of a different house. At the time debtor also told Rainwater that he and his wife had agreed to give his father a mortgage on their residence if they were

---

**2.** The remainder of the stock in Mountain Marketers, Inc. was owned, in equal shares, by Gary Day and Larry Gregory, friends of the debtor.

**3.** Although it was not uncommon for Walter T. Church to loan money to the debtor, he testified that $31,000 was the largest amount he had ever loaned to his son. Walter T. Church and the

debtor both testified at trial that the oral agreement to secure the indebtedness occurred in May 1982. Although this conflicts with debtor's deposition testimony that his proposal to secure the debt was made in August 1982, the court finds that agreement for repayment or security was reached in May 1982.

unable to sell it. Rainwater informed the debtor it would not be necessary for Kathryn to execute the mortgage because she did not own any interest in the marital residence. Although debtor requested that steps be taken to create a joint ownership of the marital residence, Rainwater suggested it was unnecessary because of the pending sale of the residence. Kathryn could simply be included as a grantee of the property the debtor expected to purchase for their new residence. There was no urgency about the matter, so debtor accepted Rainwater's suggestion.

In November 1982 the buyer who had contracted to purchase debtor's residence defaulted on his commitment. Because he was not able to sell his residence, the debtor postponed his efforts to purchase the more expensive dwelling. Rainwater learned of the aborted sale shortly before December 8, 1982, either through a comment made in an unrelated telephone conversation or by a casual comment of the debtor's father at a civic meeting. Rainwater then suggested that the debtor proceed to execute the mortgage to secure the loans from his father connected with the yacht. Rainwater prepared a trust deed whereby the debtor and his wife conveyed their residence in trust to secure payment of a $50,000 note payable to debtor's parents. He also concurrently prepared a warranty deed transferring ownership of the residence from the debtor to the debtor and his wife as tenants by the entirety. The note and the two deeds were executed on December 8, 1982, but the deeds were not recorded until February 9, 1983. Rainwater recalled he had asked the debtor in December 1982 to get him a check for the filing fees and that he then put the two deeds in his file. Later, in February 1983 when the debtor visited his office on another business matter, Rainwater came upon the unrecorded deeds in his file. Thereupon he asked for and obtained a personal

check from the debtor for the filing fees. Rainwater subsequently had the deeds recorded.

On March 22, 1983, a voluntary chapter 11 petition was filed on behalf of WDC, Inc. d/b/a Smoky Mountain Market, Inc. (Smoky Mountain Markets).[4] Hoping a successful reorganization of Smoky Mountain Markets could be achieved, the debtor ceased active involvement in all other businesses, including Mountain Marketers.

On or about March 8, 1983, Walter T. Church acquired a majority interest in Mountain Marketers by purchasing the combined twenty (20) percent interest of the debtor's friends for $10,000.[5] He took control of Mountain Marketers and began to actively manage its business. On May 23, 1983, the debtor transferred to Walter T. Church his forty (40) percent interest in Mountain Marketers for $5,000, one-half the amount paid two months earlier for only twenty (20) percent of the stock.[6]

The parties stipulated that the debtor received $50,950 from the sale of assets which is not accounted for through his banking records. According to the debtor, he began to sell luxury items in December 1982 to eliminate cash flow problems resulting from unsuccessful projects associated with the World's Fair. His sales of luxury items are all disclosed in his statement of financial affairs.

## II

■ It is well-settled that the statutory right to discharge in bankruptcy is construed liberally in favor of the debtor and strictly against an objecting creditor. *In re Leichter,* 197 F.2d 955, 959 (3rd Cir. 1952), *cert. denied,* 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953). The plaintiff has the burden of proof at the trial of his objection to discharge. Bankr. Rule 4005, 11 U.S.C.A. Although the burden of going forward with evidence may shift after

---

4. See Case No. 3–83–00455.

5. See note 2, *supra,* and accompanying text.

6. No money was received for debtor's interest in the Mountain Marketer stock. Instead, a $5,000 credit was applied against a $25,000 demand note, dated March 17, 1983, executed by the debtor in favor of Walter T. Church.

plaintiff establishes a prima facie case, *First Texas Savings Ass'n, Inc. v. Reed,* 700 F.2d 986, 992 (5th Cir.1983), the ultimate burden of persuasion remains upon the plaintiff. *First Federated Life Ins. Co. v. Martin,* 698 F.2d 883, 887 (7th Cir. 1983).

Section 727(a) of Title 11 of the United States Code enacts in material part:

> The court shall grant the debtor a discharge, unless—
>
> .     .     .     .     .
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred ...
>
> > (A) property of the debtor, within one year before the date of the filing of the petition;
>
> .     .     .     .     .
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets....

■ To sustain an objection to discharge under § 727(a)(2)(A) the objecting party must prove the following elements:

> (1) that the act complained of occurred at a time subsequent to one (1) year before the date of the filing of the petition;
>
> (2) with intent to hinder, delay, or defraud a creditor;
>
> (3) that the act was that of the debtor or his duly authorized agent; and
>
> (4) that the act consisted of transferring, removing, destroying or concealing property of the debtor, or permitting any of these acts to be done.

4 *Collier on Bankruptcy* ¶ 727.02[b] (15th ed. 1984).

This court recently considered the nature of the "intent" necessary to deny discharge when an objection is based upon § 727(a)(2):

> Under Code § 727(a)(2) actual intent to hinder, delay, or defraud is necessary; a constructive fraudulent transfer is insufficient to support denial of discharge. *Bank of Pennsylvania v. Adlman,* 541 F.2d 999, 1003 (2d Cir.1976); *In re Fragetti,* 24 B.R. 392, 396 (Bankr.S.D.N.Y. 1982). Although the intent must be actual it may be proved through circumstantial evidence. *Farmers Coop. Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982); *Montgomery Ward & Co., Inc. v. Gordley,* 38 B.R. 630, 632 (Bankr.S.D. Ohio 1984).

*Comprehensive Accounting Corp. v. Morgan,* 43 B.R. 264, 271 (Bankr.E.D.Tenn. 1984).

The proof adduced by FDIC does not sustain its contention that the debtor intended to hinder, delay, or defraud creditors through any of the three prepetition transfers questioned.

Although the debtor stated during a pretrial deposition that he was "struggling" in February 1983 and that he had been for some months, he was not experiencing serious personal financial problems in December 1982. His corporate and partnership ventures related to the World's Fair had proven generally unprofitable. But, a personal financial statement prepared postpetition and showing his financial condition as of February 9, 1983, reflects a net worth exceeding $600,000.[7] Indeed, until November 1982 when his buyer breached a commitment, the debtor was seeking to purchase a new residence valued at approximately $100,000 more than the residence he expected to sell.

■ Apparently both the debtor and Kathryn Church believed she obtained an in-

---

**7.** Debtor's schedules reflect debts totaling $6,774,305.01 and assets valued at only $1,799,679.00 as of July 8, 1983. The disparity between his financial statement and schedules is attributable to debtor's omission from his financial statement of both assets and liabilities contained in the Church Petroleum Marketers agreement. This agreement involved a trust wherein Jake Butcher agreed to indemnify and hold harmless the debtor with respect to all liabilities within the scope of the agreement.

terest in their marital residence in May 1980 when they were married. The debtor testified that he thought his wife had automatically obtained an equal interest in the residence upon their marriage, without regard to whether her name was on the deed. Debtor insists, and the court finds, that the sole purpose of the transfer creating the tenancy by the entirety with his wife was to fulfill a prenuptial commitment. There is no proof that the debtor was confronted with demands for payment or lawsuits by creditors as of the date of the transfer to Kathryn Church. Consummated without any urgency or prompting by creditors, the execution and recordation of the deed creating a tenancy by the entirety in the marital residence was an incidental event in debtor's financial affairs.

■ Likewise, the court finds that the debtor did not intend to hinder, delay, or defraud creditors through the transfer to his parents of a mortgage interest in his marital residence. The proof regarding debtor's pre-existing debt to his father is uncontradicted. Debtor's purpose and intent in granting the mortgage, executed contemporaneously with the deed to Kathryn Church, was to secure his indebtedness. The mortgage was executed without urgency and at a time when the debtor's personal financial position appeared quite favorable.

■ The court further concludes that the transfer of debtor's stock in Mountain Marketers was made without any intent to hinder, delay, or defraud creditors. When Walter T. Church gained controlling interest in Mountain Marketers in March 1983, he thought that Mountain Marketers had been released, through assumption by a third party, from any obligation under an equipment lease with United American Financial Corporation. In fact, however, in April 1983 United American Financial Corporation asserted a deficiency claim of $188,000 against Mountain Marketers.

8. See note 6, *supra*, and accompanying text.

The debtor testified that he became aware of the deficiency claim in April 1983. He and his father sought legal counsel about the value of his forty (40) percent interest in Mountain Marketers prior to the May 23, 1983, transfer. Although Walter T. Church did not think the debtor's interest was worth $5,000, he wanted to help his son and agreed to credit that amount against a demand note owing to him by his son.[8] According to his attorney, the debtor's forty (40) percent interest in Mountain Marketers was actually worthless when transferred to Walter T. Church. The corporate financial statement of Mountain Marketers for the period ending February 28, 1983, reflects a $6,079.66 deficit. The corporate financial statement as of July 31, 1983, including the United American Financial claim, shows a $196,619.79 deficit.

## III

■ The remaining issue is whether discharge should be denied for failure to satisfactorily explain a loss of assets. Prior to trial the parties stipulated that the debtor would be required to explain the disposition of $50,950 in cash proceeds not accounted for through his bank records.

The stipulation is based on debtor's receipt of cash proceeds from his sale, between December 1, 1982, and July 29, 1983, of the following items:

| Item | Net Proceeds | Deposited to Bank Account | Cash Retained |
|---|---|---|---|
| Office Furniture | $ 6,196 | $ 6,196 | |
| Condominium-Schmidt | 20,200 | 20,200 | |
| Rolex Watch & Other Jewelry | 9,800 | | $ 9,800 |
| Mercedes | 18,000 | | 18,000 |
| Cobalt Boat | 10,000 | | 10,000 |
| Apache Partnership | 22,615 | 22,615 | |
| Futures | 4,688 | 4,688 | |
| Shearson | 4,908 | 4,908 | |
| Condominium-Grove | 17,979[9] | 8,979 | 9,000 |
| Glaston Boat | 4,150 | | 4,150 |
| Totals | $118,536 | $67,586 | $50,950 |

9. During a December 1983 pretrial deposition debtor testified that he realized $40,000 from

At trial the debtor testified that during the eight-month period preceding entry of the order for relief he actually had received cash proceeds totaling $58,500, not $50,950, that were not deposited into his bank account. According to the debtor these cash proceeds were spent to meet personal and business expenses. He submitted an exhibit [10] detailing his disposition of $55,752 in cash during the period between December 1, 1982, and July 29, 1983. The difference between the amount detailed and $58,500, or $2,748, was also expended; but debtor could not testify with certainty which specific expenses were paid with the $2,748. The debtor also listed all checks written against his bank account during the relevant eight-month period.

Kathryn Church also provided a detailed account of her bank deposits, including a separate category itemizing funds received from the debtor, between December 1, 1982, and July 29, 1983. Additionally, she submitted an itemization of her expenses during the relevant period.

Debtor's statement of his financial affairs reflects total income of $230,304 in 1981 and $206,404 in 1982. Federal income tax refunds approximating $20,000 were received by the debtor for each of those years.

Debtor's prepetition spending habits are perhaps most aptly described as lavish. The purchase and sale of luxury items was not an unusual practice. He enjoyed an affluent lifestyle for several years preceding bankruptcy. He and his wife entertained guests frequently in their home, always serving "the best." They dined out weekly at the most expensive restaurants, and the debtor generally picked up the tab for everyone in their dinner party. Extra-ordinary amounts were spent on birthday and Christmas gifts for family members. Additionally, it was debtor's custom to make generous gifts to friends. The debtor traveled on business and pleasure several times annually. He owned pleasure boats and condominiums in resort areas. He customarily used cash as opposed to credit cards. His checking account was used almost exclusively to pay bills paid through the mail. Several witnesses confirmed the debtor's lifestyle and spending habits.

In an opinion involving the predecessor of Code § 727(a)(5) the court stated:

> The word "satisfactorily" ... may mean reasonable or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or the shortage. He is satisfied. He no longer wonders. He is contented.

*In re Shapiro & Ornish*, 37 F.2d 403, 406 (N.D.Tex.1929), *aff'd*, 37 F.2d 407 (5th Cir. 1930).

The court finds the debtor's explanation of his disposition of $55,752 in cash during the eight months preceding bankruptcy is both credible and satisfactory.[11] His inability to specifically account for $2,748 is understandable given the extent and size of his business involvement and personal expenditures. This is particularly true since the debtor customarily used cash, with the exception of bills paid through the mail.

The objection to discharge is overruled. This Memorandum constitutes findings of

---

the sale of the condominium sold to James K. Grove. (Deposition of W. Dwight Church at 42.) However, debtor stated he was guessing about the amount realized and advised that the closing sheet on the sale had been turned over to his trustee in bankruptcy. Accordingly, the court assumes that FDIC is satisfied that debtor realized only $17,979 from the sale.

**10.** See Exhibit 24.

**11.** No witness was presented to contradict debtor's explanation of his expenditure of the sum in question.

fact and conclusions of law, Bankruptcy Rule 7052.