SlKORA, J.

RULING

Upon consideration of all motion and opposition materials (including affidavits and exhibits, certain answers to interrogatories, excerpted deposition testimony and deposition exhibits, and memoranda of law), of oral argument, and of certain docketed post-hearing correspondence, the court hereby ALLOWS in full the motion for summary judgment submitted by defendant Union Carbide Corporation against liability upon Count One (for negligence); Count Two (for breach of warranty); Count Three (loss of parental consortium by Ashley Dusoe); and Count Four (loss of marital consortium by Jeanette Dusoe).

ORDER FOR JUDGMENT

Judgment of no liability shall now enter in favor of the defendant Union Carbide Corporation and against the plaintiff, Paul Dusoe upon Counts One and Two; in favor of the defendant Union Carbide and against the plaintiff Ashley Dusoe p.p.a. upon Count Three; and in favor of the defendant Union Carbide Corporation and against the plaintiff Jeanette Dusoe upon Count Four.

REASONING

Introduction

A. Specification of the Plaintiffs’ Theory of Liability

The plaintiffs Paul, wife Jeanette, and daughter Ashley, Dusoe have narrowed their common claim of liability to the specific theory of a failure to warn Paul Dusoe of the risk of operating an oxy-acetylene welding torch system without the use of check valves as a safeguard against the danger of an acetylene backflow and resulting explosion.
The following facts are undisputed. The accident and injury to Mr. Dusoe occurred on November 9, 1995. He was then 32 years old. As of that date he had been the proprietor of a Meineke Muffler franchise shop for about 13 years. He had used oxy-acetylene welding torch systems on a daily basis for about 15 years. He had assembled the system which he was using on that day. He was using a welding torch to dismantle a boiler in the cellar of a multi-unit house which he had purchased and which he was renovating for rental use.
The system consisted of the following components; (1) an oxygen tank; (2) an oxygen regulator attached to the tank; (3) a smaller acetylene tank or cylinder; (4) an acetylene regulator attached to the acetylene tank; (5) a welding torch; and (6) two parallel hoses, one leading from the oxygen tank to the welder’s torch and the other from the acetylene tank to the torch; the hoses (parallel but fastened together) converged at the butt end of the torch and fed their respective gases through its handle structure and into its nozzle.
Union Carbide had manufactured the oxygen regulator, Model R-205, in or about 1972. Dusoe had *110 accumulated numerous oxygen and acetylene regulators over time. He did not know whether he had purchased or acquired this one new or used; or when he had acquired it; or from what “local welding shop.” He did not remember whether any instructions, directions, or warnings had accompanied it. The earliest date of acquisition would have been 1979. He had sent the regulators out for repair as needed.
For work on the day of the accident he had put together the elements of the welding torch system. After three hours of work on the boiler, his oxygen tank became empty. He then closed down both that tank and the acetylene cylinder, disconnected the oxygen tank, and shut the two entry valves of the torch. He called a supplier to deliver a tank of oxygen to the house. It arrived in about 45 minutes.
Mr. Dusoe then began to attach the R205. oxygen regulator to the replacement tank by screwing the nut on the regulator onto the valve of the tank. He tightened the nut. He heard a whistling sound. The explosion occurred. To the best of his memory, he did not open the valve on the top of the new tank to release the oxygen.
Through expert testimony Mr. Dusoe would submit the following explanation of the cause of the explosion. Acetylene from the torch flowed backward through the oxygen hose and into the R-205 regulator. It made contact there with high pressure oxygen gas emerging from the new tank. The volatile mixture exploded. The oxygen from the replacement tank emerged because the tank valve had become open.
Union Carbide’s liability would arise from its failure to warn a user of the R-205 regulator of the need for the mechanism of “check valves” in an oxy-acetylene torch system. The function of check valves is to occlude or prevent the backflow of acetylene from a welding torch into contact with a high pressure feed of oxygen. Dusoe’s claim is that the warning and the resulting use of check valves would have prevented the accident.
In Count One Paul Dusoe alleges negligence by reason of Union Carbide’s failure to warn in its capacity as the manufacturer of the oxygen regulator component of the oxy-acetylene welding system. In Count Two he alleges that the same failure to warn constitutes a breach of the warranty of fitness and of merchantability [G.L.c. 106, §2-314(c); c. 106, §§2-314 through 2-318]. The consortium Counts Three for loss of parental benefits and Four for loss of spousal benefits will stand or fall with first two Counts for primary liability.
B. Standards for Summary Judgment
As the party moving for summary judgment against the Dusoes’ theory of liability, Union Carbide must now demonstrate the absence of a triable issue of liability. In the circumstances of this case, it is contending that the Dusoes have no reasonable likelihood or expectation of proving one or more essential elements of their claim of a failure to warn. See especially Kourouvacilis v. General Motors Corporation, 410 Mass. 706, 714-17 (1991) (leading Massachusetts discussion). See also Symmons v. O’Keefe, 419 Mass. 288, 293 (1995); Wheatley v. AmericanTel & Tel. Co., 418 Mass. 394, 397 (1994); and Tetrault v. Mahoney, Hawkins & Goldings, 425 Mass. 456, 459 (1997); all endorsing the standard of “no reasonable expectation of proving an essential element” of the plaintiffs claim as the basis of summary judgment for the defendant.
C. The Prima Facie Elements of the Negligence and Warranty Claims
Negligence by the manufacturers of a product requires proof of the generic elements of (1) the failure to exercise the degree of care reasonable in the circumstances; (2) proximate causation; and (3) injury and/or loss. E.g., Beaver v. Costin, 352 Mass. 624, 626 (1967); and Scott v. Thompson, 5 Mass.App.Ct. 372, 374 (1977).
A number of refinements have accumulated upon the specific claim of a manufacturer’s negligence by reason of failure to warn. (1) The manufacturer has a duty to communicate adequate warnings and instructions about the nature and extent of dangers accompanying the use or foreseeable misuse of the product of which it knows or should know. See e.g., Mitchell v. Sky Climber, Inc., 396 Mass. 629-31 (1986); H.P. Hood & Sons, Inc. v. Ford Motor Co., 370 Mass. 69, 75 (1976); and Welch v. Keene Corp., 31 Mass.App.Ct. 157, 163 (1991), further app. rev. denied, 411 Mass. 1163. (2) The manufacturer has no duty to warn users of a possible risk beyond the zone of foreseeable use or misuse of the product. Mitchell v. Sky Climber, Inc., 396 Mass. at 632. (3) The warning should aim at the average user or reasonably prudent person. Knowlton v. Deseret Medical Inc., 930 F.2d 116, 121 n.3 (1st Cir. 1991). (4) While the manufacturer is generally better situated to know and to warn about defects and dangers, the duty to warn can diminish (or vary inversely) with the increased experience or competence of the user. Marques v. Bellofram Corp., 28 Mass.App.Ct. 277, 280 (1990). A product becomes defective by reason of a failed warning if the omitted or inadequate notice or instruction would have reduced or avoided the foreseeable risks of harm and if the omission or inadequacy rendered the use of the product unsafe. Restatement of Torts: Product Liability §2(c) (1997).
Under the alternate concept of breach of warranty, similar rational corollaries apply. (1) The manufacturer must warn adequately about foreseeable risks. Yates v. Norton Co., 403 Mass. 70, 74 (1988); Hayes v. Ariens Co., 391 Mass. 407, 413-14 (1984). (2) Even for a properly designed product, it should provide warnings capable to reducing or avoiding foreseeable risks of harm. Hayes v. Ariens Co., 391 Mass, at 413; Casagrande v. F.W. Woolworth Co., Inc., 340 Mass. *111 552, 555 (1960). (3) The same standard of Restatement (Third) of Torts: Product Liability §2(c) applies. (4) The warranty duty has rational limits. The manufacturer need not warn of known or obvious dangers. It has no duty to furnish additional warnings of potential dangers to users already knowledgeable about such hazards. Maldonado v. Thompson Nat’l Press Co., 16 Mass.App.Ct. 911, 912-13 (1983); Florentino v. A.E. Staley Mfg. Co., 11 Mass.App.Ct. 428, 436 (1981), further opp. rev. denied. The language of the Maldonado decision is especially emphatic. “A manufacturer’s duty to warn purchasers and expected users of its product refers to latent dangers in the normal and intended use of the product [cases collected] . . . The duty to warn assumes some reason to suppose a warning is needed [cases collected].” Id. at 912.
The standards under both negligence and warranty doctrine weigh the foreseeability of the use of the product; the visibility of the danger; and the knowledge or competence of the user.

I. The Role of Union Carbide’s Oxygen Regulator as a Component Part of the Oxy-Acetylene Welding System Assembled by Paul Dusoe

A check valve is a product separate from an oxygen regulator (deposition of plaintiffs expert Donald Lynn at 207-08). As the name suggests, an oxygen regulator governs the flow of that gas through tubes or hoses. It can have multiple applications. One is to adjust the supply of oxygen to an oxy-acetylene torch. Others can include uses in health or hospital apparatus (id. at 230). The R-205 regulator was one of six elements combined by Dusoe into the torch system (along with the oxygen tank, the acetylene tank, the acetylene regulator, the hoses, and the torch itself). The check valves would have fitted onto the body of the torch. The manufacturer of the torch was Harris Calorific, Inc. It produced the torch in or about 1982 with factory assembled check valves. (Affidavit of Harris company product engineer David W. Gáiley dated August 9, 2002, paragraphs 2, 3, 6-9, and Exhibit B thereto at 2, 3.) Dusoe appears to have acquired the components as independent devices or products. His experts found no defect in the regulator {id. at 207-08).
In these circumstances, Massachusetts law appears to preclude liability on the part of the component manufacturer. The reasoning of the Supreme Judicial Court in Mitchell v. Sky Climber, Inc., 396 Mass. 629, 630-32 (1986), fits the present facts. In the course of a survey of decisions from multiple jurisdictions, the court concluded that the defendant (Sly Climber) manufacturer of an electric lift motor had no duty to warn the assembler of scaffolding of the dangers (of electrocution) resulting from improper rigging of the scaffold (causing laceration of the insulation of the motor wires). The language of the court was categorical. Id. at 631.
We have never held a manufacturer liable, however, for failure to warn of risks created solely in the use or misuse of the product of another manufacturer . . . The prevailing view is that a supplier of a component part containing no latent defect has no duty to warn the subsequent assembler or its customers of any danger that may arise after the components are assembled [federal and state decisions collected].
Accord, Cippolone v. Yale Ind. Products, Inc., 202 F.3d 376, 379 (1st Cir. 2000).
Here Dusoe would impose on Union Carbide a duty in 1995 to warn users of a sound 1972 oxygen regulator about the risk of its integration with a dangerously altered 1982 welding torch. Union Carbide had no duty to warn him about “risks created solely in the use or misuse of the [welding torch] of another manufacturer.” As a practical matter, that rule would draw support from the attenuated foreseeability of such risks. In the absence of a pattern or history of telling accidents, the component manufacturer cannot feasibly anticipate the details of the assemblage of its product into larger mechanisms and cannot feasibly foresee the defects in the other components of the fully assembled results. Nothing in the present factual material indicates that Union Carbide should reasonably have foreseen, and therefore warned against, the use of its oxygen regulator in these circumstances. The rule of the Mitchell case, affirming summary judgment, therefore furnishes adequate ground for full summary judgment in favor of Union Carbide.

II. Mr. Dusoe’s Knowledge and Experience in the Operation of Oxy-Acetylene Torches

The competence and knowledge of the user may reduce or eliminate the duty of the manufacturer to warn of the risks of the use and foreseeable misuse of the product. In addition to the decisions cited above (Introduction Parts C and D), see Hoffman v. Houghton Chemical Corporation, 434 Mass. 624, 629-31 (2001 ) (dicta), and American Mutual Liability Ins. Co. v. Firestone Tire & Rubber Co., 700 F.2d 993, 995 (5th Cir. 1996) (holding that the plaintiff reasonably should have been knowledgeable about the danger of over inflating tires after two years on the job as an agricultural service tireman), as expressions of the so-called “sophisticated user doctrine.”
Mr. Dusoe had extensive experience and abundant chargeable knowledge. As a young man in 1980 or 1981, he had attended a Meineke Muffler franchise training program of several weeks. It included instruction and testing about the use of oxy-acetylene torch work including the use of regulators and check valves. (Dusoe Deposition 28; 41; 195-96.) The program included formal testing upon the subject (id. at 29; Union Carbide Exhibit B at questions 30, 31, 39, 40, 64, and 79). [1] Through subsequent years as a Meineke franchisee, he had trained employees in the use of the equipment (Dusoe Deposition at 221-23). Above all he *112 had long-running continuous experience (id. at 39-40):
Q. Prior to [the date of the accident], would you consider yourself to be experienced in the use of an oxy-acetylene system?
A. Yes
Q. And generally describe the experience that you had had with it.
A. 15 years of daily use.
These facts tend drastically to reduce the need and the utility of a warning from Union Carbide to Paul Dusoe about the danger of doing oxy-acetylene welding without check valves.
By itself, this factor might not amount to conclusive ground for the entry of summary judgment because knowledge or sophistication are inherently arguable concepts of degree and because one of Dusoe’s experts would dispute the characterization of him as a sophisticated user (deposition of Donald Lynn at 162-63). However, even under this generous view, Dusoe’s chargeable experience and knowledge in combination with the component part rule (Section 1 above) drives his claim further below the line of any reasonable expectation of proof of liability against Union Carbide.
III. The Questionable Presence of Foundation Evidence Necessary for Expert Testimony in Support of Dusoe’s Acetylene Bachflow Hypothesis
The discovery materials contain Dusoe’s clear and repeated testimony that he did not open the valve of the replacement oxygen tank (deposition at 128; 133; 271). However, the essential factual hypothesis of his two experts is that he must have opened the oxygen valve so as to enable the acetylene backflow and the resulting explosion (deposition of Donald Lynn at 253-54; 266-67; deposition of Sherif El Wakil at 103-04).
At trial the admissibility of the experts’ opinion of the cause of the explosion would be contested. Union Carbide (and the other defendants) would argue that the foundation for the opinion would be absent and the testimony excluded so as to doom the claim. They view testimony of an open oxygen valve as an essential predicate for the offer of the opinions and as a corollary of the requirement of Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994): that the trial judge as gatekeeper must determine the applicability of the proffered expert opinions (or contested methodology) to the underlying facts of the case.
Dusoe makes a more traditional evidentiary contention: that he is not bound by his arguably mistaken memory that he did not open the oxygen tank; and that he is entitled to the admission of better testimony about such an “objective” or “physical” fact (as distinguished from binding testimony about such subjective facts as his own emotions, motives, and perceptions knows peculiarly or exclusively to him). The precedents support the distinction. See especially Reynolds v. Sullivan, 330 Mass. 549, 551-53 (1953).
The issue is arguable. The discussion in Lanigan [and its analysis of Daubert v. MerreUDow Pharmaceuticals, Inc., 509 U.S. 579 1993,] focuses on the reliability of new methodologies (i.e. the substance of expert opinion) rather than on the adequacy of a foundation for the offer of straight forward or unremarkable opinion about technical subject matter. The later situation is ours. The reasoning of Reynolds v. Sullivan, 330 Mass, at 551-53, would leave Dusoe with a chance to introduce the opinion of engineers El Wakil and Lynn. (The ruling would belong to the trial judge.) As the summary judgment decision maker, I do not And this argument by Union Carbide strong enough to assure exclusion of the essential expert testimony and thereby to generate an independent ground for summary judgment. I do find Mr. Dusoe’s deposition testimony to provide a potential evidentiary benefit to all defendants and therefore to provide incremental value to their summary judgment positions that he lacks a reasonable expectation or likelihood of proof of his claim.

IV. Mr. Dusoe’s Alleged Failure to Read the Warning

Union Carbide argues that Dusoe’s lack of a specific memory whether he had read its manual or directions about the oxygen regulator prevents proof of the essential proximate causal connection between an omitted or inadequate warning and the accident. If he would not have examined an adequate warning even if available, he cannot claim that its absence changed his conduct and caused the accident.
However, Dusoe’s deposition testimony upon this point is more complicated. He testified that he could not recall whether he had read any informational materials accompanying the Union Carbide regulator; but that he had generally read manuals accompanying the approximately 12 oxygen regulators which he had purchased over the years (deposition at 182-83); and that he had read “all of the safety instructions” furnished by manufacturers (id. at 231). The net state of the testimony is inconclusive. It leaves open a genuine issue of material fact preventing summary judgment upon this ground as an independently adequate basis.
Conclusion[2]
Defendant Union Carbide is entitled to the entry of summary judgment upon all claims against it. Plaintiff Paul Dusoe has no reasonable expectation of proving that Union Carbide had or breached a duty to warn him about the risks of use of oxygen regulator R-205 at the time of his 1995 accident (1) because it manufactured only a component of the assembled system resulting in the accident and therefore could not reasonably foresee the use or misuse of that integrated device 23 years later; and (2) because Mr. Dusoe’s experience and knowledge reduced or eliminated the need and utility of a warning. The first ground is *113 independently adequate for this conclusion. The second ground may not furnish an independent basis for it, but substantially reinforces the improbability of proof of the claim. The derivative consortium claims must end with the primary negligence and warranty counts.

One question and answer from the Meineke training program examination is especially pertinent:
79) Check valves are required at the regulators and the Y-connectors. True or False? ANSWER [by Paul Dusoe]: T[rue].

I have considered the parties’ post-hearing letters as supplemental argument or memoranda. I have excluded from consideration any factual matertals (additional affidavits and exhibits) submitted after the hearing.