**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

———————————————

**No. 98-31008**

———————————————

**IN THE MATTER OF: PAUL WILLIAM ORSO,**

**Debtor.**

———————————————

**VALERIE CANFIELD,**

**Appellant,**

**v.**

**PAUL WILLIAM ORSO AND MARTIN A. SCHOTT,**

**Appellees,**

———————————————————————————————————

**Appeal from the United States District Court for the**
**Middle District of Louisiana**

———————————————————————————————————

June 27, 2000

Before JONES, DeMOSS, and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Valerie Canfield ("Canfield") appeals the denial of her objection to the claim by her former husband, Paul William Orso ("Orso"), that certain annuities he receives as part of a structured tort settlement are exempt from the property of his bankruptcy estate under Louisiana law. La. R.S. 22:647. The bankruptcy and district courts attempted to distinguish our decision in Young v. Adler, 806 F.2d 1303 (5th Cir. 1987), which

held that certain types of annuities are not exempt. Although the issue is close, we conclude that <u>Young</u> governs this case, and we reverse and remand with instructions to include Orso's annuities in the property of his estate.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In November 1986, several months after Canfield and Orso were married, Orso was involved in a serious automobile accident which left him permanently and severely brain damaged. As a result of his injuries, Orso became mildly mentally retarded with an I.Q. of less than 70.

Orso and Canfield filed suit against several defendants seeking damages for the injuries sustained by Orso in the accident. In September 1989, the tort action was settled, and Orso and Canfield entered into consent judgments with the defendants. Under the terms of the settlement, both Orso and Canfield were to receive lump sum payments. In addition, Orso was to receive monthly payments for the rest of his life, with 30 years of payments guaranteed to Orso or his designee, from two defendants and their insurers (collectively the "defendants"). The defendants purchased annuity contracts to provide Orso with the agreed upon monthly payments.

In May 1990, Orso and Canfield obtained a judgment of separation and entered into a settlement of community property agreement. In December 1990, Canfield filed a petition in state

2

court to enforce certain provisions of the community property settlement agreement. Orso and Canfield were formally divorced in January 1991. In July 1994, the state court entered judgment in favor of Canfield for $48,000 in arrearages and ordered Orso to pay Canfield $1,000 per month for the succeeding five months.

Five days after entry of the state court order, Orso filed a Chapter 7 bankruptcy petition. Orso listed as an asset the periodic payments he received as a result of the structured settlements from the 1987 tort action, but he claimed that these payments were exempt from the bankruptcy estate as annuities under La. Rev. Stat. Ann. § 22:647 (West 1995).

Canfield filed her proof of claim with the bankruptcy court for $53,494.92, which represented the judgment entered by the state district court for Orso's arrearages. The bankruptcy court denied Canfield's motion for relief from the automatic stay, her request that the court abstain from exercising jurisdiction, and her motion to dismiss. Canfield also objected to Orso's claim of exemption for the annuity proceeds. The bankruptcy court upheld the exemption after a lengthy analysis of Young and Louisiana's exemption statute for annuities. Canfield has appealed the district court's order affirming the claim of exemption.

## II. ANALYSIS

The issue on appeal is whether Orso's structured settlement payments derive from annuities exempt from creditors'

3

claims pursuant to Louisiana law, or whether, as in Young, they are *de facto* payments on a nonexempt debt owed to Orso.[1]

Once the debtor commences an action in bankruptcy, all property in which the debtor has a legal or equitable interest becomes property of the bankruptcy estate. 11 U.S.C.A. § 541 (West 1993); McManus v. Avco Financial Services of Louisiana, 681 F.2d 353, 354 (5th Cir. 1982). After all the property is subsumed within the bankruptcy estate, the debtor may exempt certain property, insulating it from most creditors' claims. McManus, 681 F.2d at 354. Under the Bankruptcy Code, states can allow their debtors to exempt (1) property included in the federal "laundry list" of exemptions, 11 U.S.C.A. § 522(d), or (2) property specified under Louisiana law and federal laws other than 11 U.S.C. § 522(d). Id. at 355. Since Louisiana "opted out" of the federal laundry list of exempt property, Louisiana law governs whether Orso's structured settlement payments constitute exempt annuities.

At the time Orso filed his bankruptcy petition, exemptions for annuities were covered by the old version of La. Rev. Stat. Ann. § 22:647B, which states:

> The lawful beneficiary, assignee, or payee, including the annuitant's estate, of an annuity contract, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the contract against the

---

[1] This court reviews questions of bankruptcy law *de novo*. See Matter of Cromwell, 138 F.3d 1031, 1033 (5th Cir. 1998)(citing In re Kennard, 970 F.2d 1455, 1457-58 (5th Cir. 1992)). We have jurisdiction over this appeal from the grant of an exemption in bankruptcy, which is a final order.

4

creditors and representatives of the annuitant or the person effecting the contract, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use.

Although § 22:647(B) was amended in 1999,[2] federal law requires this court to apply the state law in effect at the time the debtor filed his bankruptcy petition. See 11 U.S.C. § 522(b)(2)(A)("an individual debtor may exempt from property of the estate ... any property that is exempt under ... State or local law that is applicable on the date of the filing of the petition....").  The fact that the amendment is interpretive, and that the Louisiana Legislature expressly intended the amendment to have retroactive application, does not change our analysis. See In re John Taylor Company (Taylor v. Knostman), 935 F.2d 75 (5th Cir. 1991).  In Taylor, this court held that the debtor could not avail herself of an amendment to the Texas homestead exemption that was passed subsequent to her filing for bankruptcy protection.  As in the present case, the amendment was "expressly made retroactive" and

---

[2] Acts 1999, No.63, § 3, amended subsection B of § 647 to state that "[t]he term 'annuity contract' shall include any contract which: ... (b) [s]tates on its face or anywhere within the terms of the contact that it is an 'annuity' including but not limited to an immediate, deferred, fixed, equity indexed, or variable annuity, irrespective of current pay status or any other definition in Louisiana law."  La. Rev. Stat. 22:647(B)(2)(1999).  According to § 4 of Acts 1999, No. 63, the foregoing amendment "is interpretive and shall apply to any annuity contract or tax-deferred arrangement covered by the provisions of the Act which is in existence on or prior to the effective date of this Act."

merely changed how the exemption at issue was "defined." Id. at 78. The Taylor court refused to apply the amendment, though, given the explicit language of § 6 of the Bankruptcy Act of 1898, which is almost identical to § 522(b)(2(A):[3] "Texas law cannot, however, change the post-bankruptcy rights of claimants and creditors as determined by federal law, especially in the face of the explicit language of § 6." Id. Thus, in following Taylor, this court must determine the scope of the Louisiana annuity exemption by reference to the law existing at the time of the bankruptcy filing in 1994.

In its opinion, the bankruptcy court expressed its understanding of the "proper" scope of unamended § 22:647 (hereinafter, simply "§ 22:467") as well as its dislike for Young. Having found, as a matter of fact, that each stream of payments constitutes an annuity under La. Rev. Stat. Ann. § 20:33, the bankruptcy court held that the annuities were exempt under the plain language of § 22:647. Alternatively, the bankruptcy court purported to distinguish Young on grounds discussed later herein. The district court agreed with the bankruptcy court's reasoning: "The conclusion that these contracts are indeed annuities mandates that under Louisiana law ... each is exempt from seizure."

By relying on their understanding of the "plain language" of the statute, the lower courts declined to follow Young -- even

---

[3]     Section 6 of the Bankruptcy Act of 1898, formerly 11 U.S.C. § 24, provided that the Bankruptcy Act "shall not affect the allowance to bankrupts of the exemption which are prescribed ... by the State laws in force at the time of the filing of the petition."

6

though Young interpreted the statute at issue. In Young, this court made an Erie guess as to how the Louisiana courts would interpret § 22:647. Having made such a guess, neither the lower courts nor this court is at liberty to ignore the precedential value of this interpretation:

> [W]hen our *Erie* analysis of controlling state law is conducted for the purpose of deciding whether to follow or depart from prior precedent of this circuit, and neither a clearly contrary subsequent holding of the highest court of the state nor a subsequent statutory authority, squarely on point, is available for guidance, we should not disregard our own prior precedent on the basis of subsequent intermediate state appellate court precedent unless such precedent comprises unanimous or nearly unanimous holdings from several -- preferably a majority -- of the intermediate appellate courts of the state in question.

Federal Deposit Ins. Corp. v. Abraham, 137 F.3d 264, 269 (5th Cir. 1998). Prior to Orso's filing, no Louisiana appellate court had questioned this court's interpretation of § 22:647.[4] Furthermore, until § 22:647 was amended, neither the Louisiana Supreme Court nor the Louisiana legislature had questioned this court's interpretation of § 22:647. Thus, in determining the law that was

---

[4]     Subsequent to Orso's filing, only one Louisiana appellate court had challenged the Young interpretation. See Welltech, Inc. v. Abadie, 683 So.2d 809 (La. Ct. App. 5 Cir. 1996). Since this court must apply the unamended version of § 22:647 given Taylor and § 522(b)(2)(A), we do not reach the issue of whether the amended version of § 22:647 constitutes "a subsequent statutory authority, squarely on point" that would abrogate our prior holding in Young.

7

in effect at the time of Orso's filing, this court is bound by Young's analysis of the unamended Louisiana statute.[5]

In Young, the debtor, an attorney, could not exempt payments received on an otherwise non-exempt debt for legal services by funding those payments with an annuity. The Young court held that even if the payments may "strictly speaking, [be] an annuity," this court must "pierce the veil of this arrangement to determine its true nature." Young, 806 F.2d at 1306. Thus, whether the payments are exempt depends on the nature of the stream of payments: "It is the substance of the arrangement rather than the label affixed to it that determines whether the payments are exempt under the Louisiana statutes as proceeds from an annuity, or accounts receivable, and part of the bankruptcy estate." Id. at 1307.

The court relied on several factors to determine the true nature of the arrangement. According to Young, annuities that are exempt under § 22:647 have the following features: (1) they are rights to receive fixed, periodic payments, either for life or for

---

[5] In their brief, the Appellees contend that the bankruptcy court applied the appropriate method of analysis — what they called the "civilian lawyer's method of analysis." Apparently, this method involves looking at the operative Louisiana statutes anew, independently of prior Fifth Circuit analysis: "the real reason the Appellant's argument fails is because the statute and its lack of limitations is so clear." But this court relies on strict stare decisis rather than civilian analysis and cannot simply ignore the legal interpretation of § 22:647 provided in Young. Even though the bankruptcy court believes this court needs to re-think Young's suggestion that the "retention of a claim against an underwriter or purchaser of an annuity is equivalent to maintaining control over the fund used to purchase the annuity," In re Orso, 219 B.R. 402, 459 (M.D. La. 1998), the bankruptcy court is not empowered to re-think and overturn Fifth Circuit precedent on its own. As Taylor and Abraham make clear, this court is bound to follow its prior Erie analysis of § 22:647.

8

a term of years, (2) the annuitant has an interest only in the payments themselves and not in any fund, and (3) the annuitant surrenders all right and title in and to the money he pays for the annuity. Id. at 1306-07. A stream of payments constitutes a non-exempt account receivable if: (1) the creditor has a claim against the debtor, (2) the debtor agrees to pay the creditor in installments at regular intervals, (3) the debt or principal sum is due to the creditor although payable only in the manner agreed upon, and (4) the creditor has a property interest in the debt or principal sum. Id.

Although Young was owed an account receivable for attorney's fees and Orso is owed compensation for an injury, the factors that were determinative in Young are also determinative in the present case. Given the way the parties structured the settlement, "the monthly payments made to [Orso] represent nothing more than installment payments on debts to cover [the underlying debt] owed by the [debtors]." Id. at 1307. Under the terms of the agreement, Orso did not retain an ownership interest in the annuity itself, but he remained a creditor of the parties who owed the installment obligations.[6] That is, the settlement of the

---

[6] For example, Orso's settlement agreement with Cook Construction Company, Inc. and Liberty Mutual Insurance Company of Massachusetts states that "the Insurer on behalf of the Defendant hereby agrees to pay the following sums ...

      B.    $1,180.00 per month for life with 30 years of said payments guaranteed to him or to his designee should he die before 30 years, said payments beginning on October 15, 1989...

9

underlying tort action gave Orso a claim against the tortfeasors and their insurers for specific amounts. The defendants agreed, inter alia, to pay Orso $2,030.00 per month for 30 years or for life, whichever was greater. Thus, the minimum amount to which Orso was entitled is $730,800.00 (($2,030 * 12) * 30). As in Young:

> as each monthly payment is made it reduces by a proportionate amount the [minimum] debt. [Orso], therefore, retains a right against the underwriters to the remaining principal until the debt is fully extinguished... Retaining such a right renders the so-called annuity, in substance, nothing more than an account receivable, and not exempt from the bankruptcy estate.

Young, 806 F.2d at 1307. Unlike Young, if Orso lives longer than 30 years, Orso is entitled to continue receiving payments. But this difference does not alter the Young analysis. Orso retains a right in the minimum principal sum and in any payments due and owing to him for living more than 30 years after the effective date of the settlement agreement. This is sufficient to give Orso the requisite "interest in not just the payments under the annuity, but in ... the installment debt owed him by the [defendants]." Id.

Furthermore, as in Young, Orso did not deliver a sum of money to anyone to fund the annuities, which is a central

---

Plaintiff is and shall be a general creditor to the Defendant and/or the Insurer... The Defendant or the Insurer may fund Periodic Payments by purchasing ... an annuity policy... All rights of ownership and control of such annuity policy shall be vested in the Defendant or the Insurer." (emphasis added). Orso's settlement agreement with the State of Louisiana has similar language.

10

characteristic of an annuity.[7]  The annuity was funded by the tortfeasors in exchange for Orso's releasing the defendants from tort liability for the 1986 accident.  Thus, Orso's settlement agreements satisfy all the factors set out in Young: (1) Orso had a claim against the debtors, (2) the debtors agreed to purchase an annuity that would pay Orso installments at regular intervals, (3) Orso is entitled to the payments but has no control over the manner or timing of distribution, and (4) Orso has a property interest enforceable against the tortfeasors and their insurers in the payments due under the settlement agreements.  Therefore, under Young, the payments received by Orso are not exempt.[8]

The Appellees' attempts to distinguish Young are unpersuasive.[9]  The Appellees contend that the payments are exempt because Orso constructively paid for the annuities.  But the funds

---

[7]    This court also addressed what constitutes an annuity under Louisiana law in Farm Credit Bank of Texas v. Guidry, 110 F.3d 1147 (5th Cir. 1997).  The court held that the general definition of an annuity, which governs the term as it is applied elsewhere in the Civil Code, is set out in article 2793 of the Louisiana Civil Code: "Article 2793 defines an annuity as follows: 'The contract of annuity is that by which one party delivers to another a sum of money, and agrees not to reclaim it so long as the receiver pays the rent agreed upon.' Under that definition, a fundamental characteristic of an annuity is the complete divestiture by the annuitant of all ownership interest in the principal fund ... an annuitant surrenders all right and title in and to the money he pays for it." Id. at 1150.

[8]    See also In re Rhinebolt, 131 B.R. 973, 976 (Bankr. S.D. Ohio 1991); In re Johnson, 108 B.R. 240, 243 (Bankr. D.N.D. 1989).

[9]    The district court distinguished Young by stating that the contract in Young was a different kind of contract than the one in this case.  The district court did not explain the ways in which the contracts differed.  For the reasons discussed above, this court rejects this cursory analysis and holds that Orso's structured settlement is sufficiently similar so as to be governed by this court's analysis in Young.

11

were no more constructively paid by Orso than by Young. And the Young court did not consider constructive payment sufficient. In fact, in order to be exempt, the court stated that Young should have accepted his total fees at the time of settlement and then purchased an annuity policy with the remainder. In so doing, Young would have transferred his interest in the funds as consideration for periodic payments. But neither Young nor Orso did this. As a result, each had "an interest in not just the payments under the annuity, but in a larger sense also in the principal fund or source -- the installment debt owed him by the [defendants] -- just as if he had left the money with the [defendants] and agreed to accept payment in installments." Id. at 1307.

In addition, contrary to the Appellees' suggestion, the fact that Young's lump sum payment would have been taxable as ordinary income, whereas Orso's personal injury award would not (see §§ 104 and 130 of the Louisiana Tax Code), is not dispositive. Neither is the fact that Young was not the plaintiff in the suit that gave rise to the settlement agreement. The Young court did not predicate its interpretation of § 22:647 on tax considerations or the "non-plaintiff" status of the person claiming an exemption; rather, Young depends only on the factors discussed above. Instead of accepting a lump sum settlement, Orso and Young "left the money with the debtors" and permitted them to satisfy their obligation by means of annuity contracts. The consequence of making such a

12

tactical decision during settlement negotiations is that the stream of payments is not exempt.

## IV.  CONCLUSION

Given Taylor, the scope of the Louisiana annuity exemption is "determined by reference to the law existing ... [at] the time of the filing of the petitions."  935 F.2d at 78.  Since § 22:647 was amended after Orso filed his bankruptcy petition, this court is bound to follow Young's interpretation of unamended § 22:647.  See Abraham, 137 F.3d at 269.  Under Young, even though the debt owed to Orso is funded by an annuity, this court must look at the nature of the underlying stream of payments to determine whether it is an exempt "annuity" or a non-exempt debt in the nature of an account receivable.

Applying the Young factors to this case, Orso's payments are non-exempt.  Under the terms of the settlement agreements, Orso received regular installments from annuities funded by the debtors. Orso had no control over the annuities, but he was guaranteed to receive monthly payments for at least 30 years, and he retained rights against the tortfeasors if the annuities failed.  Such "installment payments of a debt ... do not constitute an annuity" under Young and are not exempt from property of Orso's bankruptcy estate.  Young, 806 F.2d at 1307.  We reverse and remand with instructions to include the annuities in Orso's estate.

**REVERSED AND REMANDED.**

13

DENNIS, Circuit Judge, dissenting.

This is a state law question of whether the beneficiary of an annuity contract is entitled to the proceeds and avails of the annuity exempt from liability for any debt against all creditors. The beneficiary's right to the exemption depends on the statutes and decisions of the law of the state by which it was created. "[T]he law of the states [] issue[s], and has been recognized by this court as issuing, from the state courts as well as from the state legislatures.  When we know what the source of the law has said that it shall be, our authority is at an end."  Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372 (1910) (Holmes, J., dissenting).

Justice Holmes's dissents in Kuhn and Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518 (1928) were adopted by the Supreme Court as the correct view of the rights which are reserved by the Constitution to the several states in Erie Railroad Company v. Tompkins, 304 U.S. 64 (1938).  For the court, Justice Brandies wrote:

> Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.  And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.  There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in

14

their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts. . . . [T]he constitution of the United States[] recognizes and preserves the autonomy and independence of the states,--independence in their legislative and independence in their judicial departments. Supervision over either the legislative or the judicial action of the states is in no case permissible except as to matters by the constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the state, and, to that extent, a denial of its independence.

Id. at 78-79.

Recently, by Acts 1999, No. 63, § 3, the Louisiana Legislature interpreted and clarified the exemption statute in question, La.R.S.22:647(B), providing that: "[t]he term 'annuity contract' shall include any contract which: . . . (b) [s]tates on its face or anywhere within the terms of the contract that it is an 'annuity' including but not limited to an immediate, deferred, fixed, equity indexed, or variable annuity, irrespective of current pay status or any other definition of 'annuity' in Louisiana law." See La.R.S. § 22:647(B)(2)(West 1999). The act further provides that the foregoing amendment "is interpretive and shall apply to any annuity contract or tax-deferred arrangement covered by the provisions of

15

this Act which is in existence on or prior to the effective date of this Act."  La. Acts 1999, No. 63, § 4.

In Louisiana, "[p]rocedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."  La. Civ. Code art. 6 (1988).  The Louisiana Supreme Court, in Ardoin v. Hartford Accident and Indemnity Co., explained that "interpretive legislation does not create new rules, but merely establishes the meaning that the interpreted statute had from the time of its enactment. It is the original statute, not the interpretive one, that establishes rights and duties."  360 So.2d 1331, 1338 (La. 1978) (citing Gulf Oil Corp. v. State Mineral Board, 317 So.2d 576 (La. 1974); 1 M. Planiol, Treatise on the Civil Law, No. 251 (La.State L.Inst.Transl. 1959); A. Yiannopoulos, Civil Law System 68 (1977)); circuit precedent in accord Pierce v. Hobart Corp., 939 F.2d 1305, 1308-09 (5th Cir. 1991); Harrison v. Otis Elevator Co., 935 F.2d 714, 719 (5th Cir. 1991); Louisiana World Exposition v. Federal Ins. Co., 858 F.2d 233, 244-45 (5th Cir. 1988); Laubie v. Sonesta Int'l Hotel Corp., 752 F.2d 165, 167-68 (5th Cir. 1985).

Consequently, our authority to "Erie guess" at the original meaning of La. R.S.22:647(B) is foreclosed within the ambit of the legislature's interpretive act.  As Justice Holmes said, "When we know what the source of the law has said that it shall be, our authority is at an end."  Kuhn, 215 U.S. at 372 (Holmes, J.,

16

dissenting). "'The authority and only authority is the State, and if that be so, the voice adopted by the State as its own (whether it be of its Legislature or of its Supreme Court) should utter the last word.'" Erie R. Co., 304 U.S. at 79 (quoting Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 535 (1928) (Holmes, J., dissenting). Except as to matters by the constitution specifically authorized or delegated to the United States, we have no "supervision over either the legislative or the judicial action of the states." Id. "[E]ven the independent jurisdiction of the circuit courts of the United States is a jurisdiction only to declare the law, at least, in a case like the present, and only to declare the law of the state. It is not an authority to make it." Kuhn, 215 U.S. at 370 (Holmes, J., dissenting). "The law of a state does not become something outside of the state court, and independent of it, by being called the common law", id., stare decisis, or circuit precedent.

Because the constitution forbids our interference or invasion of the authority of the state, I disagree strongly with the assertion of my colleagues in the majority that this court's decision in In re John Taylor Company, 935 F.2d 75 (5th Cir. 1991), limits the authority and independence of the State of Louisiana through its legislature, as well as its supreme court, to interpret and declare the original meaning of its own laws. I do not think this court's Erie guess as to how the Louisiana Supreme Court would

17

have decided the Young case is in conflict with the legislature's recent interpretive act. But, even if it is, the law of the state does not become something outside of the state court or the state legislature, and independent of it, by being interpreted differently in an Erie guess. Furthermore, the In re John Taylor Company decision does not hold that a state may not interpret the original meaning of its law. On the contrary, the court in that case simply held that a substantive change in the Texas state constitution increasing the amount of property defined as a homestead, which expressly stated that it was retroactive, could not be substituted for the state exemption designated by the Bankruptcy Act as applicable to a bankruptcy case filed prior to the change in the substantive law. See In re John Taylor Co., 935 F.2d at 78. The Bankruptcy Act stated that it shall not affect exemptions prescribed by the state laws in force at the time of the filing of the petition. See id. This court stated that "Taylor is entitled to the homestead exemption available at [the time of the petition in 1979], not to the new homestead exemption put into force in 1983." Id. In the present case, in contrast with In re John Taylor Company, there has been no substantive change in the state law, which, if given full retroactive effect would conflict with the bankruptcy law. There is no retroactive law at issue in

18

the present case.[10] An interpretive act declares or clarifies the original meaning of the statute; it is not a substantive change in the law; it does not conflict with the federal bankruptcy law. If there is a conflict between the interpretive act and the <u>Young</u> decision based on an <u>Erie</u> guess, as the majority contends, it is a disagreement over the interpretation of a state law, as to which, the Supreme Court has held, the state shall have the "last word." <u>Erie</u>, 304 U.S. at 79.

I think it is clear beyond any reasonable doubt that if the very broad interpretation of La.R.S.22:647 by Act 63 of 1999 were to be applied to the present case, Orso would be entitled to exemptions of the periodic payments derived from annuities related to his structured settlements. None of the parties contends otherwise, and I do not read the majority opinion as disagreeing with that proposition either. This ought to suffice. For the sake of completeness, however, I will point out additional factual and legal grounds which I believe reinforce our <u>Erie</u> duty to uphold the state law exemptions as interpreted by their source and affirm the bankruptcy and district courts.

<u>Young v. Adler</u>, 806 F.2d 1303 (5th Cir. 1987), is so thoroughly distinguishable, factually and legally, from Orso's case, that

---

[10]"'In [the case of an interpretive act], there is an apparent rather than real retroactivity, because it is the original rather than the interpretive law that establishes rights and duties.'" <u>Ardoin</u>, 360 So.2d at 1338 (citing and quoting A. Yiannopoulos, <u>Civil Law System</u> 68 (1977)). Moreover, Act 63 expressly states that it "is interpretive and shall apply to any annuity contract or tax-deferred arrangement covered by the provisions of this Act which is in existence on or prior to the effective date of this Act." La. Acts 1999, No. 63, § 4.

19

Young's Erie guess must be disregarded as affecting our Erie duty to follow the legislature's interpretive act, or our (perhaps academic) guess as to how the Louisiana Supreme Court would decide Orso's claim to an exemption under Louisiana law and the facts of this case.[11] (1) In Young, this court affirmed decisions of mixed facts and law by the bankruptcy and district courts, by Erie-guessing on a slate clear of state cases, that the trustee (in a state law creditor's shoes), under state law, could "pierce" or disregard the structured payment of the debtor's attorney's fees funded by an annuity and disallow the lawyer Young's claim to state statutory exemptions of the periodic annuity funded payments. On the contrary, in Orso we should affirm the bankruptcy and district court's Erie guess that the state's highest court would find Young's piercing of an annuity used to fund payment of attorney's fees distinguishable and would not permit a creditor to "pierce" or disregard Orso's exemption of periodic annuity payments used to fund a personal injury structured settlement under state law.[12] (2)

---

[11]La.R.S. 22:647(B) (1987) provides:
The lawful beneficiary, assignee, or payee, including the annuitant's estate, of an annuity contract, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the contract against the creditors and representatives of the annuitant or the person effecting the contract, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use.

[12]Even if I am wrong in concluding that we are bound directly by the legislature's interpretive act, we now have new state law guidance that was unavailable to the Young court: two recent decisions by a state court of appeal

20

The structured settlement of a personal injury claim (as in Orso) is based on a historical (since 1918) public policy of excluding tort-based damages or settlements from federal income taxes, whether paid in lump-sum, installments, or funded by periodic annuity payments.[13]  On the other hand, attorney's fees are not excludable from federal income taxes and attempted tax deferrals through structured payments of attorney's fees have been disapproved by the IRS.  (3) Louisiana law provides creditors' actions and remedies to "pierce," disregard and avoid debtors' transactions made with constructive or actual intent to defraud or defer his creditors' claims.  Conversely, Louisiana law has never afforded any creditor an action to "pierce," disregard or avoid a solvent debtor's transfer made without extrinsic evidence of constructive or actual intent to defraud his creditors or to prefer a particular creditor's claim.  Accordingly, in Young there was a basis in state law for a bankruptcy trustee in a creditor's shoes to "pierce" and avoid the attorney debtor's use of a structured payment of attorney's fees through purportedly exempt annuity payments to unlawfully exclude and defer federal income taxes and

_____

upholding the exemption of annuities (one of which was apparently used in a personal injury structured settlement), the state supreme court's evident approval of the decisions, and the state legislature's interpretation of the exemption statute indicating that it was intended to include the annuities used in Orso's structured settlements.

[13]Indeed, although not presented in this case, an argument could be made that federal law has preempted the field with respect to the proper configuration of tax free personal injury structured settlements so as to bar a state from discriminating against them in the application of state exemption statutes.

21

to defraud, delay or hinder his creditors. Conversely, however, Louisiana law provides no basis for a creditor or trustee to "pierce," disregard, or avoid Orso's non-fraudulent, non-taxable, properly configured, annuity funded structured settlement of his personal injury claims in accordance with the Internal Revenue Code and IRS Revenue Rulings. (4) Consequently, a decision by this court to reverse the bankruptcy and district courts' decisions that the highest state court would not permit a creditor to "pierce" and disregard Orso's structured settlements, annuities, and state law exemptions would amount to a drastic departure from two lines of Circuit precedent. In Matter of Reed, 700 F.2d 986, 990 (5th Cir. 1983), which preceded the Young case and has been consistently followed by this Circuit, we held that § 522 of the Bankruptcy code does not permit federal courts to disallow state exemptions in the absence of extrinsic evidence of fraud and a state law action to disallow the exemption for fraud. In Walden v. McGinnes, 12 F.3d 445 (5th Cir. 1994), we upheld the state law exemption of periodic payments funded by annuities as part of a structured settlement under a Texas statute similar to Louisiana's.

1.

Subsequent to Matter of Young at least one Louisiana Court of Appeal has expressly ruled, with the Louisiana Supreme Court's

22

clear implicit agreement, that, under La.R.S. 20:33,[14] La.R.S.22: 647(B), and La.R.S. 13:3881(D)(1),[15] payments to lawful beneficiaries under annuity policies used to fund structured settlements are exempt from seizure or liability for the debt of the beneficiary or payee. See Welltech, Inc. v. Abadie, 666 So.2d 1237, 1239 (La.App. 5th Cir. 1996); see also Cashio v. Tollin, 712 So.2d 254, 255-56 (La.App. 5th Cir. 1998)(judgment debtor's annuity payments under an arrangement that was clearly a structured settlement were exempt from garnishment under La.R.S. 13:3881(D) and from seizure by creditors under La.R.S. 22:33 as "[i]t is clear that the Louisiana Legislature intended to exempt the proceeds and avails of annuities from any seizure." (citing Abadie, 683 So.2d 809 (La.App. 5th Cir. 1986), writ denied, 712 So.2d 864 (La. 1998)). The Louisiana Fifth Circuit held that, under Louisiana statutory authority (including La.R.S. 22:647(B)), payments from annuity

---

[14]La.R.S. 22:33 provides in pertinent part: "The following shall be exempt from all liability for any debt except alimony and child support: (1) All pensions, all proceeds of and payments under annuity policies or plans, all individual retirement accounts, all Keogh plans, all simplified employee pension plans, and all other plans qualified under Sections 401 or 408 of the Internal Revenue Code. However, an individual retirement account, Keogh plan, simplified employee pension plan, or other qualified plan is only exempt tot he extent that contributions thereto were exempt from federal income taxation at the time of contribution, plus interest or dividends that have accrued thereon."

[15]La.R.S. 13:3881(D)(1) provides: "The following shall be exempt from all liability for any debt except alimony and child support:  all pensions, all proceeds of and payments under annuity policies or plans, all individual retirement accounts, all Keogh plans, all simplified employee pension plans, and all other plans qualified under Sections 401 or 408 of the Internal Revenue Code. However, an individual retirement account, Keogh plan, simplified employee pension plan, or other qualified plan is only exempt to the extent that contributions thereto were exempt from federal income taxation at the time of contribution, plus interest or dividends that have accrued thereon."

policies purchased with funds representing attorneys fees owed to Abadie for legal services he had rendered to clients were exempt from seizure and from garnishment to satisfy a judgment against Abadie.  See Abadie, 666 So.2d at 1239.  The Abadie court concluded that the payments were exempt as annuity proceeds regardless of the nature of the original obligation that the annuities were, in effect, designed to discharge.   See id. at 1241.

The judgment creditor petitioned for, and the Louisiana Supreme Court granted, a writ of certiorari and review of the appellate court decision.  See 672 So.2d 698 (La. 1996).  However, after reviewing the case, the Supreme Court vacated the decision of the court of appeal and remanded for consideration of "whether the obligation (as opposed to the annuity payments) of the Intermediaries to Abadie are exempt from seizure." Id.  Thus, the Supreme Court reviewed and implicitly approved of the appeals court's holding that the annuity payments were exempt from seizure. The Supreme Court vacated without expressing any disapproval and remanded the case only for consideration of an additional unraised and unaddressed issue.   On remand, the state Fifth Circuit reaffirmed its original ruling in favor of the beneficiaries of the annuities and held that the intermediaries (the insurance companies who had purchased the annuities to satisfy the obligation to pay the attorneys fees) were also protected by the exemption statute. See 683 So.2d 809, 811-12 (La.App. 5th Cir. 1996).  The judgment

24

creditors again applied for writ of certiorari and/or review, and the Louisiana Supreme Court denied the application. See 712 So.2d 864 (La. 1998).

Thus, the Supreme Court's actions in Abadie evinced its clear approval of the court of appeal's decisions and not simply a routine writ denial. In fact, the situation in the present case is inverse to that presented by F.D.I.C. v. Abraham, 137 F.3d 264 (5th Cir. 1998), upon which the majority relies. As in Abraham, "a subsequent statutory authority [Act 63 of 1999], squarely on point, is available for guidance[.]" Id. at 269. But contrary to the situation in Abraham, in the present case the recent interpretive act of the legislature, together with the state supreme court's own expressions and actions augur in favor of an eventual holding by the Louisiana Supreme Court that would make preeminent the Abadie court's decisions.

2.

A very important distinction between the Young case and Mr. Orso's case grows out of the different purposes for which the structured settlements and annuities were used in each case. The structural settlement of a personal injury claim, an outgrowth of the historic public policy of excluding tort-based recovery from federal income taxes, is specifically approved and encouraged by the Internal Revenue Code, IRS revenue rulings, and IRS tax letters. The use of a structural settlement arrangement to defer

25

the payment of federal income taxes on attorney's fees has not been approved by tax laws and regulations but has been expressly disapproved of by the IRS.

In one form or another, Congress has expressly excluded from gross income tort damages received on account of personal injuries since 1918.  See Roemer v. Commissioner of Internal Revenue, 716 F.2d 693, 696 (9th Cir. 1983) (citing the Revenue Act of 1918 § 213(b)(6), 40 Stat. 1066).  A "probable purpose" for this special exclusion is that "Congress may have intended to confer a humanitarian benefit on the victim or victims of the tort." Norfolk and Western Railway Co. v. Liepelt, 444 U.S. 490, 501 (1980)(Blackmun, J. dissenting); see also Epmeier v. United States, 199 F.2d 508, 511 (7th Cir. 1952).

The structured settlement of personal injury claims has been approved as a method by which the claimants may receive the non-taxable principal settlement amount in periodic payments and also receive the benefit of earnings on the principal amount as tax free enhancements of each periodic payment.  In contrast, if a personal injury claimant accepts a lump sum cash settlement and uses it to purchase his own annuity, the interest or gains earned on the principal sum of the annuity could not be excluded from the claimant's taxable income.  By configuring a structured settlement as one of those specifically approved by the Internal Revenue Code

26

and Revenue Rulings, however, the personal injury claimant may accomplish the same end without incurring additional income taxes.[16]

As the Court of Appeals in <u>Western Union Life Assurance Co. v. Hayden</u>, 64 F.3d 833, 839 (3rd Cir. 1995), explained:

> Structured settlements are a type of settlement designed to provide certain tax advantages. In a typical personal injury settlement, a plaintiff who receives a lump-sum payment may exclude this payment from taxable income under I.R.C. S 104(a)(2) (providing that the amount of any damages received on account of personal injuries or sickness are excludable from income). However, any return from the plaintiff's investment of the lump-sum payment is taxable investment income. In contrast, in a structured settlement the claimant receives periodic payments rather than a lump sum, and all of these payments are considered damages received on account of personal injuries or sickness and are thus excludable from income. Accordingly, a structured settlement effectively shelters from taxation the returns from the investment of the lump-sum payment. <u>See</u> Rev.Rul. 79-220, 1979-2 C.B. 74. <u>See</u> <u>also</u> Sen.Rep. No. 97-646, 97th Cong., 2d Sess. reprinted in 1982 U.S.C.C.A.N. 4580, 4583 (explaining that Pub.L. No. 97-473, 96 Stat. 2605, codified Rev.Rul. 79-220 at 26 U.S.C. S 104(a)(2)).

---

[16]Structured settlements provide advantages for both the plaintiff, the defendant, and the defendant's liability insurers. Claimants can exclude all of the payments from their gross income for federal tax purposes, and the payments can be made dissipation-proof, secure, management-free, and the payments can be configured so that the recipient cannot outlive them; defendants and liability insurers can often secure settlements for less money than is required for all-cash settlements, and they can assign their obligation to make periodic payments to avoid a continuing liability to make the future payments. <u>See</u> Paul J. Lesti, <u>Structured Settlements</u> § 1.1 (2d ed. 1993).

In Revenue Ruling 79-220, the IRS held that the exclusion from gross income provided by I.R.C. § 104(a) applied to the full amount of the monthly payments received by the plaintiff in settlement of a personal injury damage suit "because [the plaintiff] had a right to receive only the monthly payments and did not have the actual or constructive receipt or the economic benefit of the lump-sum amount that was invested to yield that monthly payment[;]" and if the plaintiff should die before the end of 20 years, the payments made to the plaintiff's estate under the settlement agreement are also excludable from income under I.R.C. § 104. Rev.Rul., 1979-2 C.B. 74.

The configuration of the structured settlement at issue in Revenue Ruling 79-220 has been closely followed in many subsequent cases. In the situation addressed by the ruling, the plaintiff, an individual, sued the defendant for damages for personal injuries. Before trial, the plaintiff accepted an offer by the defendant's liability insurer to settle the suit for a lump-sum payment of $8,000 and the liability insurer's agreement to provide the plaintiff with the discounted present value of the monthly payments of $250 for plaintiff's lifetime or 20 years, whichever is longer, the payments to be made to plaintiff's estate after plaintiff's death if plaintiff should die before the end of 20 years. Plaintiff had no right to monthly income (the present value of which, at date of settlement, was less than the total monthly

payments to be provided) or to control the investment of that amount.  See Rev.Rul. 79-220.

To provide the monthly payments for the plaintiff, the defendant's liability insurer purchased a single premium annuity contract from a life insurance company.  The defendant's liability insurer advised the life insurance company issuing the annuity to make payments directly to plaintiff.  However, the defendant's liability insurer is the owner of the annuity contract and has all rights of ownership, including the right to change the beneficiary. "[The plaintiff] can rely on only the **general credit** of [the defendant's liability insurer] for collection of the monthly payments."  Id. (emphasis added).[17]

The IRS concluded that under these circumstances, "there is a continuing obligation by the defendant's liability insurer to pay $250 per month to plaintiff for the agreed period.  The liability insurer's purchase of a single premium annuity contract from the

_____

[17]The Liberty Mutual structured settlement agreement contained nearly identical language regarding the obligation to make periodic payments: "Plaintiff is and shall be a general creditor to the Defendant [Cook Construction] and/or the Insurer [Liberty Mutual]. Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff and no part of the payments called for herein or any assets of the Defendant and/or the Insurer is to be subject to execution or any legal process for obligation in any manner, nor shall the Plaintiff have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise." It also provided that "The Defendant or the Insurer may fund Periodic Payments by purchasing a 'qualified funding asset,' within the meaning of Section 130(d) of the Internal Revenue Code, in the form of an annuity policy from Liberty Life Assurance Company of Boston.  All rights of ownership and control of such annuity policy shall be vested in the Defendant or the Insurer.  The Defendant or the Insurer may have the Annuity Carrier [Liberty Life] mail payments directly to the Plaintiff."

That this settlement agreement was designed to comport with the model approved in Revenue Rule 79-220 could not be clearer.

29

[life] insurance company was merely an investment by the liability insurer to provide a source of funds for the liability insurer to satisfy its obligation to the plaintiff. . . . [and] the arrangement was merely a matter of convenience to the obligor and did not give the recipient any right in the annuity itself." Id; see also Rev. Rule 79-313 (same result where liability insurer "M" agrees to make periodic payments without purchasing an annuity and facts indicated that the personal injury plaintiff's "rights against M are no greater than those of M's **general creditors**.") (emphasis added).

Until 1983, the utility of structured settlements was less than it is today because of the credit risks recipients at that time were required to assume. See Hayden, 64 F.3d at 840 (citing William Winslow, Tax Reform Preserves Structured Settlements, 65 Taxes 22, 24 (1987)). Because the annuity was merely a matter of convenience and did not give the recipient any right in the annuity, in the case of the settling defendant's default the plaintiff could not seek redress from the annuity issuer. See id. This presented a problem if the settling defendant's general credit risk was high. See id.

I.R.C. § 130 was enacted by Congress to solve this problem. See Sen.Rep. No. 97-646, 97th Cong., 2d Sess. reprinted in 1982 U.S.C.C.A.N. 4580, 4583. Section 130 allows a tax-neutral transaction in which the settling defendant assigns and a third party assumes the obligation to make periodic payments under most

30

section 104(a)(2) structured settlements.  See Hayden, 64 F.3d at 840.  When the third party assignee, usually a company in the business of assuming periodic payment obligations and financing them by purchasing annuities from life insurance companies, has a credit rating superior to that of the settling defendant, or the defendant's liability carrier, such an assignment and assumption agreement benefits the plaintiff by allowing her to rely on the assignee's superior credit.  See id. (citing Winslow, supra).

A key characteristic of an IRS approved structured settlement is that the beneficiary of the settlement does not have actual or constructive receipt of the economic benefit of the lump-sum amount that was invested to yield the monthly payments.  See id. at 839-40 (citing Rev.Rul. 79-220).  "[T]he arrangement [is] merely a matter of convenience to the obligor and [does] not give the recipient any right in the annuity itself."  Rev.Rul. 79-220.  Significantly, and contrary to the majority's mistaken belief, the fact that a plaintiff in a personal injury structured settlement "can rely on only the general credit" of the defendant or its liability insurer does not constitute "actual or constructive receipt or the economic benefit of the lump sum amount" invested to yield the monthly payments.  See id.  Moreover, also conflicting with the majority's notion, I.R.C. § 130(d) recognizes as a "'qualified funding' asset . . . any annuity contract issued by a company licensed to do business as an insurance company under the laws of any State, or any obligation of the United States, if . . . such annuity contract

31

or obligation is used by the assignee to fund periodic payments under any qualified assignment" and certain other requirements are met. I.R.C. § 130. This court, of course, may not be bound for all purposes to adopt the Internal Revenue Code's concepts of "actual or constructive receipt of the benefit of the lump sum amount invested" or "annuity." But we are _Erie_-bound to decide the question of what constitutes an annuity under the state exemption statute as the state supreme court would. I believe that it is extremely unlikely that the Louisiana Supreme Court would decide that an annuity recognized as appropriate for use in a personal injury structured settlement configured in accordance with Revenue Ruling 79-220, I.R.C. § 130, and other tax laws and regulations does not also constitute an annuity for purposes of La.R.S.22:647(B). _See_ 2 A.N. Yiannopoulos, <u>Louisiana Civil Law Treatise: Property</u> § 150 (Supp. 2000) ("For excellent analysis of the nature of annuities and the governing law, <u>see</u> <u>In re Orso</u>, 219 B.R. 402 (Bankr. M.D. La. 1998) (property exempt from bankruptcy)").

Orso entered two personal injury structured settlements to be funded with annuities and configured in accordance with I.R.C. § 130 and Revenue Ruling 79-220. Orso settled with Cook Construction Company and its liability insurer, Liberty Mutual Insurance Company for a cash sum paid at settlement and Liberty's obligation to make periodic monthly payments to Orso or to his death beneficiary for 30 years. Orso agreed that Cook Construction Company or Liberty

32

Mutual may fund the periodic payments by purchasing a "'qualified funding asset', within the meaning of Section 130(d) of the Internal Revenue Code, in the form of an annuity policy from Liberty Life Assurance Company of Boston." Subsequently, Liberty Mutual purchased such an annuity from Liberty Life in accordance with the structured settlement. The structured settlement agreement provided that Orso is and shall be a general creditor to Cook Construction Company and Liberty Mutual. As Revenue Ruling 79-220 and I.R.C. § 130 make clear, however, Orso's general creditor status does not constitute his actual or constructive receipt or the economic benefit of the lump-sum amount or prevent the annuity from being a valid annuity and "qualified funding asset." The structured settlement between Orso, Valerie Canfield Orso (Orso's wife at that time), and The State of Louisiana followed the configuration authorized by I.R.C. § 130. The Orsos agreed to release the State and the State agreed to make periodic monthly payments to Orso for thirty years. The parties also agreed that the State would assign the obligation to make periodic payments to Conseco Annuity Guarantee Company in substitution for the State's obligation and that Conseco would fund the obligation by purchasing an annuity from Western National Life Insurance Company. In accordance with the structured settlement agreement, Conseco purchased an annuity from Western National Life. The settlement agreement provides that Conseco, as owner of the annuity contract, possesses the sole authority to designate a change of

33

beneficiary, but that such a request by the payee shall not be unreasonably withheld.

Both of the structured settlement agreements entered by Orso with the state and with Cook Construction and Liberty Mutual provided that the periodic payments cannot be accelerated, anticipated, assigned, alienated, seized, executed upon, or subjected to other legal process. As the bankruptcy court correctly found, Orso's personal injury structured settlements with the State of Louisiana and with Cook Construction Company were funded by annuities and "structured so as to fall within the protection of §§ 104 and 130 of the Internal Revenue Code, so that as broadly as possible, the proceeds of the annuities would be excluded from Orso's gross annual income for tax purposes, and the other parties could receive any benefits afforded by the Code." 219 B.R. at 452; see also id. at n.89.

Although attorney's fees, unlike plaintiffs' personal injury recovery, are includable in gross income for federal income tax purposes, some attorneys representing claimants have attempted to defer their fees when settling a case involving structured settlements. However, the IRS has specifically targeted this type of deferred compensation. See Lesti, supra, at § 15:10.

In IRS National Office Technical Advice Memorandum, Letter 9134004 (May 7, 1991), an attorney's fee was included in the current taxable year even though he did not own the annuity, only the ability to receive the payments. The settlement agreement of

34

a personal injury lawsuit directed part of the payments that were to paid to the plaintiff to be paid to the attorney. These payments directed to the attorney were in full discharge of the plaintiff's obligation to pay the lawyer for services. The liability insurer assigned its obligation to an assignee insurance company and paid a lump sum amount sufficient for the assignee to purchase an annuity contract to cover the future payments as stated in the settlement agreement. For the attorney's payments an annuity policy was purchased by the assignee insurance company and the attorney was designated as both the annuitant and payee. See Lesti, supra, at § 15:10.

The Technical Memorandum reviewed the economic benefit doctrine under which a service recipient's creation of a fund in which a service provider has vested rights will result in immediate inclusion of the amount funded in the service provider's gross income. If the service provider's interest is nonforfeitable, a fund is created when an amount is irrevocably deposited with a third party. Because the promise to pay the attorney his fee was funded, secured and guaranteed by the payment of consideration to an unrelated third party, the attorney's right to receive the annuity's payments were nonforfeitable property under Section 83 of the IRS Code and made his entire fee taxable in the year the annuity was purchased. See id.

On the other hand, in Childs v. Commissioner, 103 T.C. 634 (1994), aff'd, 89 F.3d 856 (11th Cir. 1996), the Tax Court held in

35

two cases that attorney beneficiaries of structured settlements were entitled to favorable tax treatment. The factual situations were similar. The liability carriers were the obligors, the policy owner was the assignment company, the attorneys were only the beneficiaries of the policies, the owner could change the annuity beneficiaries, the payments could not be accelerated, deferred, increased or decreased by the recipients, and the attorneys had only general creditorship rights against the assignment company. See id. at 651. The Tax Court concluded that in one case since the attorneys did not own the policies, and because the owner could change annuitants or beneficiaries without the attorneys' consent, the promises to pay the attorneys under the structured agreement were not funded promises. See id. In the second case the Tax Court found that since the attorneys were neither the owners nor were they irrevocable beneficiaries, this meant the annuities were unfunded. See id.; see also Lesti, supra, at §15.10.1 (Cum.Supp. 1999).

Consequently, Young's attempt to exclude and defer his taxable income open attorney's fee account with an annuity in a structured payment arrangement was generically different from Orso's I.R.C. and IRS approved structured settlements. In the Orso settlements, which were carefully configured in accordance with Revenue Ruling 79-220 and I.R.C. § 130, annuities were purchased and owned by the obligor and the assignee solely for their convenience to fund their obligation to make periodic payments of initially non-taxable

36

personal injury damages recovery to Orso, the personal injury plaintiff. Orso had no constructive receipt or economic interest in the lump-sum amount invested by others, no right to accelerate or control the periodic payments, and no interest in the annuity.

On the other hand, <u>Young</u>'s structured arrangement, if not a complete sham or simulation as the <u>Young</u> courts indicated, was in all probability not a lawful deferment of taxable income, but instead appeared to be an attempt by Young to enjoy tax breaks while at the same time refusing to discharge his clients from their attorney fee obligation and retaining the right to treat the annuity as an exigible open account receivable.

3.

In the present case, neither the bankruptcy judge nor the district court found fraud or any other fact justifying the disallowance of Mr. Orso's exemption. As there is no evidence to warrant reversing for clear error on these factual determinations, the district and bankruptcy court judgments should be affirmed.

On the other hand, the bankruptcy court's decision to disallow the debtor's exemption, affirmed by the district and by this court in <u>Young v. Adler</u>, 806 F.2d 1303 (5th Cir. 1987), was arguably supported by evidence of the debtor's income tax chicanery and constructive or actual intent to defraud his creditors. Mr. Young, an attorney, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on July 20, 1984. He did not list in his schedules income in the sum of $1,875.00 per month from First

37

Colony Life Insurance Company paid pursuant to an annuity contract dated July 1, 1982.[18]  The Trustee moved that the owner of the contract, a structured settlement company, be directed to pay all future annuity payments to the Trustee, and that Mr. Young be required to turn over the sum of $11,250.00 which he had received pursuant to the annuity contract subsequent to the filing of the petition.  See id. at 1304-05.  The Debtor subsequently amended his Statement of Financial Affairs including the annuity as personal property in Schedule B-2 and claiming such property as exempt in Schedule B-4.  The Debtor listed the annuity in his "Summary of Debts and Property" as having a zero value because he claimed to have no interest in the annuity since he is only the beneficiary not the owner of the annuity.  See id. at 1304.

The bankruptcy court decided that the monthly payments were seizable and not exempt under La.R.S. 20:33 and 22:647 as payments under an annuity contract, that the owner of the contract should be directed to remit all future payments to the Trustee, and that the Debtor should turn over to the Trustee the sum of eleven thousand two hundred and fifty and no/100 ($11,250.00) dollars which he had

---

[18]The annuity contract resulted from Mr. Young's representation of the surviving spouse and children of a Mr. Fanguy in a death claim against an offshore logistics company, affiliated companies and their insurance underwriters.  A structured settlement was entered into by and between all parties in interest, including Mr. Young as counsel of record.  This agreement provided Mr. Young $25,000 immediately, and monthly payments of $1,875 for the period of fourteen years, beginning on August 1, 1982 and terminating on July 1, 1996.  The monthly payments were to come from an annuity contract, purchased by Gerald J. Sullivan & Associates, a structured settlement firm, from First Colony Life Insurance Company, for the benefit of Mr. Young. See id.

received post-petition pursuant to the payments on the debt owed him by the Underwriters.  See Matter of Young, 64 B.R. 611, 612 (Bankr. E.D. La. 1986).  The district court affirmed after the debtor appealed.  See id. at 616.

On further appeal, this court held that "[w]hile the payments Debtor claims to be exempt are, strictly speaking, an 'annuity,' they are also accounts receivable.  We must, therefore, **pierce the veil of this arrangement to determine its true nature**."  806 F.2d at 1306 (emphasis added).  Thus, Young's threshold determination as an Erie court necessarily was to decide whether the bankruptcy and district courts had properly used Louisiana law to "pierce" or disregard the structured settlement and the annuity so as to consider whether the attorney debtor had improperly converted or disguised his open account of earned attorney's fees in order to defraud creditors or avoid taxes.

Under Louisiana law, the term "piercing" or "piercing the veil" is used to describe an extraordinary remedy in which the courts permit a creditor to disregard or set aside his debtor's fraudulent transfer or simulated transfer to a third person. This remedy is the Louisiana counterpart to the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act, although the Louisiana remedies are divided into three distinct actions. "Piercing" and "piercing the veil" have also been used for the process of disregarding the legal fiction that a corporation is a legal person separate from its owners or agents.  "Piercing"  legal

forms under Louisiana law, as in other jurisdictions, is an extraordinary remedy, to be granted only rarely to prevent and deter fraud or other abuses of juridical entities or transactions.

For example, the Louisiana Supreme Court has said that, in general, courts have "disregard[ed] the corporate entity, or in synonymous terms 'pierce[ed] the corporate veil,'" when corporate form has been used to 'defeat public convenience, justify wrong, protect fraud, or defend crime.'" Glazer v. Commission on Ethics for Public Employees, 431 So.2d 752, 757 (La. 1983) (quoting United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (E.D.Wis. 1905)); see generally, 8 Glenn G. Morris and Wendell H. Holmes, Louisiana Civil Law Treatise: Business Organizations § 32.01, et seq. (1999); 1 Fletcher, Corporations §§ 41-48 (perm. ed. 1974).

Judge Albert Tate, Jr., as a Louisiana appellate jurist, used the term "piercing" to denote the technique of disregarding or setting aside either corporate forms or legal transfers. See Albert Tate, Jr., The Revocatory Action In Louisiana Law, Essays on The Civil Law of Obligations, 133 (Joseph Dainow, ed. 1969); Tech Concrete, Inc. v. Moity, 168 So.2d 347, 353 (La.App.3rd Cir. 1965)("The very purpose of actions in declaration of simulation is to pierce through self-serving acts and statements of the parties to the simulation, in order to prove a sham what these parties have attempted, by their pretended acts and declarations, to set up as

40

a real and bona fide transaction. . . . "[T]he corporation itself may be simulated and actually an alter ego of the Moitys.").

Under Louisiana law at the time of the <u>Matter of Young</u> , there were three basic actions through which a creditor could "pierce," avoid or disregard his debtor's fraudulent transfers: the revocatory action, <u>see</u> La. Civ. Code, arts. 1969-1994 (1870), the oblique action, <u>see</u> La. Civ. Code, art. 1990 (1870), and the action in declaration of simulation.[19]  <u>See</u> La. Civ. Code, art. 2239 (1870); <u>see</u> <u>generally</u> Tate, <u>supra</u>; Raymond Landry, <u>The Revocatory Action in the Quebec Civil Code: General Principles, Essays on The Civil Law of Obligations</u>, <u>id</u>. at 115; Saúl Litvinoff, <u>The Action in Declaration of Simulation in Louisiana Law</u>, <u>id</u>. at 139.

Of these the revocatory action is the most frequently used, especially as an additional remedy to those provided for directly by the Bankruptcy Code.  <u>See</u> Tate, <u>supra</u>, at 138.  It may be brought by a creditor who is prejudiced at the time by a fraudulent transfer made by his debtor to revoke or undo the transfer.  To show prejudice the creditor must establish that the transfer caused or increased the debtor's insolvency.  <u>See</u> La. Civ. Code arts. 1970-1971 (1870).  The remedy cannot be exercised by a person who only becomes a creditor of the transferee after the transfer.  <u>See</u>

---

[19]In <u>Matter of Young</u>, the annuity contract was entered and the bankruptcy petition was filed prior to the January 1, 1985 effective date of the 1984 revision of the Louisiana Civil Code Articles on conventional obligations or contracts.  The revised provisions for these actions are now codified under different articles of the Civil Code.  <u>See</u> La. Civ. Code arts. 2025-28 (action in declaration of simulation), 2036-2043 (revocatory action), 2044 (oblique action) (1985).

41

<u>id</u>. art. 1993. The transfer to be set aside must have been made with fraudulent intent or with fraud as a matter of law. <u>See</u> <u>id</u>. art. 1978. The action must be brought within a year from the time the transfer was made, in a case of an unfair preference or constructive fraud, or within a year from the time the judgment was obtained by the creditor, in a case of actual intent to defraud. <u>See</u> <u>id</u>. arts. 1987, 1994; <u>Gast v. Gast</u>, 19 So.2d 138, 141 (La. 1944).

The action in declaration of a simulation could be brought by a creditor to set aside or pierce a purported transfer in order to collect from the property as still belonging to the debtor.[20] <u>See</u> La. Civ. Code art. 2239 (1870); <u>see</u> <u>also</u> Tate, <u>supra</u> at 133; Litvinoff, <u>supra</u> at 141-42. A contract was a simulation when, by mutual agreement, it did not express the true intent of the parties. <u>See</u> Exposé Des Motifs of the Projet of Titles III and IV of Book III of the Civil Code of Louisiana 54. Under the revised articles the essence of a simulation is unchanged. <u>See</u> <u>Matter of</u> <u>Zedda</u>, 103 F.3d 1195 (5th Cir. 1997) (explaining "simulation" under La. Civ. Code arts. 2025-26 (1985)).

If a debtor caused or increased his insolvency by failing to exercise a right, the right could be exercised by the creditor

---

[20]The action in declaration of simulation is not always well understood because at common law the objectives of the revocatory action and action to declare a simulation are dealt with together under the heading of fraudulent conveyances. <u>See</u> Litvinoff, <u>supra</u>, at 139.

through an oblique action unless the right is strictly personal to the obligor. See id. art. 1990.

The Young courts must have used the revocatory action or the action to declare a simulation, or both, to pierce or disregard the annuity contract because these were the only remedies under Louisiana law by which the debtor's transfer or conversion of assets could have been disregarded, avoided or declared non-existent by the trustee. This court virtually said as much by declaring that it must "pierce the veil" of the structured settlement-annuity arrangement to determine that its "true nature" was nothing more than the open account for attorney's fees that Young had before the conversion.

Thus, reading Matter of Young as applying Louisiana law in the context of the Civil Code, doctrine, and jurisprudence of the revocatory action and action to declare a simulation provides a greater understanding of the bankruptcy and district courts' decisions in Young and the principles this court must have used to justify the piercing or disregarding of the annuity contract in that case for purposes of disallowing the exemption. The Trustee could not have prevailed using the remedies supplied directly by the Bankruptcy Code. The conversion of Young's open account to an annuity occurred more than one year pre-petition, ruling out the use of § 548 to have it avoided or disallowed. But § 544 authorized him to step into the shoes of a person who became a creditor prior to the transfer and still bring a timely revocatory

43

action or action to declare a simulation in order to avoid the transfer of the account receivable and/or pursue the property as if it were still belonging to the debtor by disallowing the exemption.

4.

Section 522 of the Bankruptcy Code adopts the position that the conversion of non-exempt property, without more, will not deprive the debtor of the exemption to which he would otherwise be entitled. See Matter of Reed, 700 F.2d 986, 990 (5th Cir. 1983); See also Matter of Swift, 3 F.3d 929, 930 (5th Cir. 1993); Matter of Perez, 954 F.2d 1026, 1029 (5th Cir. 1992); Matter of Bowyer, 932 F.2d 1100, 1102 (5th Cir. 1991); Matter of Moreno, 892 F.2d 417, 419 (5th Cir. 1990); Matter of Chastant, 873 F.2d 89, 90-91 (5th Cir. 1989); Matter of Smiley, 864 F.2d 562, 566 (7th Cir. 1989); Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 874 (8th Cir. 1988); Ford v. Poston, 773 F.2d 52, 54-55 (4th Cir. 1985); In re Coates, 242 B.R. 901, 905 (Bankr. N.D. Tex. 2000); In re Rothrock, 96 B.R. 666, 669 (Bankr. N.D. Tex. 1988); In re Moody, 77 B.R. 566, 578 (S.D.Tex. 1987), aff'd, 862 F.2d 1194 (5th Cir. 1989), cert. denied, 503 U.S. 960 (1992); In re Ford, 1986 WL 14997, at *3-4 (S.D.Tex. Dec. 19, 1986); 4 Collier on Bankruptcy ¶ 522.08[4](15th rev. ed. 2000). The rationale behind this congressional decision was summed up by this court as follows: "The result which would obtain if debtors were not allowed to convert property into allowable exempt property would be extremely harsh, especially in those jurisdictions where the exemption allowance is minimal." Reed, 700

44

F.2d at 990 (citing and quoting 3 <u>Collier on Bankruptcy</u>, ¶ 522.08[4] (15th ed. 1982)). Nevertheless, because of the legislative history of § 522 approving prior disallowance for fraud jurisprudence, it is well settled that the apparently blanket approval of conversion is qualified, allowing courts to deny exemptions under the Act if there was extrinsic evidence of actual intent to defraud and if the state law permits disallowance of the exemption for fraud.[21] <u>See</u> <u>id</u>.

In <u>Reed</u>, this court approved of the bankruptcy court's application of state law to determine both what property was exempt and whether the exemption was defeated by the eleventh-hour conversion. <u>See</u> <u>id</u>. at 990. Further, the <u>Reed</u> court recognized that the Texas constitutional and statutory protection of the homestead is absolute, and that there was state jurisprudential authority for the bankruptcy judge's interpretation of Texas law to allow the exemption in full regardless of Reed's intent. <u>See</u> <u>id</u>. at 990-91 and n.2. Because the allowance of the exemption was not challenged on appeal, however, this court stated that it did not need to determine whether under Texas law the exemption would be denied to property acquired with the intention of defrauding creditors. <u>See</u> <u>id</u>. at 991 and n.2.

---

[21]<u>See</u> 4 <u>Collier on Bankruptcy</u> ¶ 522.08[4] (15th rev. ed. 2000) ("The analytical problem with the cases that deny the debtor's exemption in these matters is that they often reach this conclusion without regard to the state law that governs those exemptions. If the state law creating the exemption does not provide for its denial on these grounds, it is questionable that denial is proper.")

Several remedies are possible when a conversion of nonexempt to exempt property with actual or constructive fraudulent intent has occurred: (1) the transfer can be avoided under § 548; (2) the case, if filed as a Chapter 7, can be dismissed for substantial abuse under 707 or the debtor can be denied a discharge under §727(a)(2); (3) the debtor can be denied the exemption if state law permits disallowance for fraud; or (4) an equitable lien can be imposed on the exempt property. See 2 Norton Bankruptcy Law and Practice 2d § 46:31 (1997)(citing authorities).

The bankruptcy trustee is given the special ability, under section 544(a) of the Code, which gives the trustee the status of a hypothetical creditor or bonafide purchaser, to step into the shoes of such purchaser or a creditor of the debtor and utilize applicable state law to avoid a transaction that the creditor could have avoided but for the intervening bankruptcy case. Section 544(b) gives the trustee the right to use applicable state law to avoid a fraudulent transfer, separate and apart from the avoidance rights given the trustee under section 548. This significantly expands the scope of the trustee's avoiding powers by enabling the trustee to utilize generally longer statutory reachback periods than the one year time frame permitted under section 548. See 5 Collier on Bankruptcy ¶ 548.01[4].

The fact findings of the bankruptcy judge, affirmed by the district court, are to be credited by this court unless clearly erroneous. See Reed, 700 F.2d at 992 (citing Northern Pipe Line

46

Constr. Co. v. Marathon Pipeline Co., 458 U.S. 50, 55 n.5 (1982); Matter of Gary Aircraft Corp., 681 F.2d 365, 375 n.14 (5th Cir. 1982); Matter of Osterle, 651 F.2d 401, 403 (5th Cir. 1981), cert. denied, 456 U.S. 989 (1982)); see also, Matter of Swift, 3 F.3d 929, 931 (5th Cir. 1993); Matter of Bowyer, 932 F.2d 1100, 1101-02 (5th Cir. 1991). Lower court findings as to whether the conversion of non-exempt property to exempt property was impermissible are critical. Because fraud is a factual finding, it will be reversed only if clearly erroneous. Few, if any, of these cases have been reversed on appeal. See 2 Norton Bankruptcy Law and Practice 2d §46:30.

Thus, federal courts have the power to disallow or disregard state exemptions if there is extrinsic evidence of fraud and if the state law permits disallowance of the exemption for fraud. Consequently, if the state exemption cannot be avoided or disregarded for fraud under state law, the exemption cannot be denied by application of state law in a bankruptcy proceeding by a bankruptcy court or other federal court.

The facts of the Orso case do not present any justification for "piercing" or disregarding the exemption of his annuity payments or the annuity contract under Louisiana law. First, for the reasons stated earlier, it is extremely unlikely that Mr. Orso entered the structured settlement funded by the annuities with the intent to delay, hinder or defraud his creditors. Mr. Orso's accidental injuries caused him to become mentally retarded. The

47

structured settlement agreements – signed not only by Mr. Orso but also by Ms. Canfield (the instant creditor) – authorizing creation of the annuity contracts were entered into in September of 1989, a full five years before the Chapter 7 petition was filed. Moreover, Mr. Orso had been interdicted two years before the bankruptcy was filed, and his mother was appointed his curatrix because he was incompetent to handle his financial affairs.

Second, the structured personal injury settlements and the annuity contracts of which Mr. Orso is the beneficiary were standard, genuine transactions. Unlike Mr. Young, Mr. Orso did not convert an open account to an annuity with intent to delay, hinder or defraud creditors. Nor did Mr. Orso retain an exigible right to full and immediate payment of an open account debt against the defendants as Mr. Young perhaps did by not releasing his clients and the defendants in the structured settlement. Mr. Orso has an exigible right only to the periodic payments as set forth in the structured settlement release. Mr. Orso has no interest in the principal fund or source of the annuities such as the bankruptcy court in Matter of Young found that Mr. Young had retained.

We ought not wait for other Louisiana courts of appeal to follow the state Fifth circuit. The Louisiana Legislature has interpreted La.R.S. 22:647 so broadly as to exempt the proceeds and avails of annuities meeting I.R.C. § 130's definition of qualified funding assets in personal injury and sickness structured settlements. There is no Louisiana authority contrary to Abadie

48

and <u>Cashio</u>. The Supreme Court has clearly implied its approval of the Louisiana Fifth Circuit's decisions in <u>Abadie</u> and <u>Cashio</u>. Our <u>Young</u> decision is very clearly distinguishable from the present case.

<u>Walden v. McGinnes</u>, 12 F.3d 445 (5th Cir. 1994), in which we held that payments to a beneficiary under this type of annuity are exempt under an exemption statute of the same stripe as the one here, is in accord with the only pertinent Louisiana court opinions. In <u>Walden</u>, this court held exempt, under a Texas statute exempting payments of benefits from annuities to employees used by any employer, payments from an annuity used to fund a breach of contract settlement.[13] Similarly, the district court in <u>In re Alexander</u>, 227 B.R. 658 (Bankr. N.D. Tex. 1998) held that payments from an annuity used in a structured tort settlement were exempt under the same Texas statute as amended in 1994 to unqualifiedly exempt any annuity issued by certain types of insurance companies from seizure by the annuitant's creditors; this statute is virtually identical to Louisiana's § 647(B) in every respect material to this case.[14] The Eleventh Circuit, in <u>In re McCollam</u>,

---

[13]"The exemption was claimed under Article 21.22 of the Texas Insurance Code, which allows exemption for, *inter alia*, benefits received 'under any plan or program of annuities and benefits in use by any employer.'" <u>Walden</u>, 12 F.3d at 448 (citing and quoting Tex.Ins.Code art 21.22 (West Supp. 1991)) (emphasis in original).

[14]Tex.Ins.Code art. 21.22 (West Supp.1994) provides:
[A]ll money or benefits of any kind, including policy proceeds and cash values, to be paid or rendered to the insured or any beneficiary under any policy of insurance or annuity contract issued by a life, health or accident insurance company, including mutual and fraternal insurance, or under any plan or program of annuities

49

986 F.2d 436 (11th Cir. 1993), held that annuity payments in a structured tort settlement were exempt under a Florida statute closely similar to the Louisiana statute.[15]  Mr. Orso's situation is not legally or factually distinguishable from countless other personal injury cases throughout the nation, as well as in Louisiana, Texas, and Mississippi in which claimants have innocently and in good faith entered bona fide structured settlements funded by genuine annuities.  The exemption statutes in all of these states are virtually identical.  So far as I have been able to determine, no court in the United States has disallowed the claim of an innocent personal injury or breach of contract claimant to a state exemption of his periodic payments funded by an annuity under a structured settlement.

For the foregoing reasons, I dissent.

---

and benefits in use by any employer or individual, shall:
....
  (2) be fully exempt from execution, attachment, or garnishment or other process;  [and]
....
  (4) be fully exempt from all demands in any bankruptcy proceeding of the insured or beneficiary.

[15]Section 222.14, Florida Statutes (1989) provides:
The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state and the proceeds of annuity contracts issued to citizens or residents of the state, upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected for the benefit of such creditor.